**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

A.J.T., a minor child, by and through her Parents, A.T. and G.T.; and A.T. and G.T., individually and jointly,

Plaintiffs,

v.

Osseo Area Schools, Independent School District No. 279; and Osseo School Board,

Defendants.

Civil File No. 21-CV-1760 (MJD/DTS)

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

This case is about the District's refusal to provide A.J.T. the same full school day provided to her peers without disabilities because her disability prevents her school attendance before noon. The District, through its staff and administration, subjected A.J.T. and her Parents to intentional and irrational discrimination and retaliation on the basis of her disability and their advocacy over six years despite repeated requests for intervention on behalf of A.J.T. The essential elements material to conclude that the District has discriminated against A.J.T. and her family and caused harm are undisputed.

It is undisputed that A.J.T. is a student with disabilities and that the Osseo Public Schools ("the District") is obligated to provide her with effective special education and related services, as well as access to an education equal to her peers without disabilities in order to avoid disability discrimination. There is no question that students without

disabilities in the District are provided a full school day in accordance with state law, as well as a variety of after-school activities. There is no dispute that A.J.T. is medically unable to attend school before noon and needs a modified school schedule. Five letters from A.J.T.'s treating neurologists to the District are uncontested. Every year her Parents signed authorizations to permit the District to obtain unlimited information from her neurologists but the District did not want to or did not bother to obtain that information. During discovery her Parents again signed authorizations to permit the District to obtain unlimited information from all of her medical providers, but again the District did not want to or did not bother to obtain that information (or did obtain it without disclosure to Plaintiffs). Her treating neurologist, Dr. Galen Breningstall, testified at the special education hearing about the medical necessity of a noon start time, stating that it would lead to an "inevitable worsening of her problems" to start her school day earlier.[1] He also clearly supported a full school day for A.J.T. in his testimony.[2] Disability, not parental preference, was and remains the *sole reason* that A.J.T. cannot start her school day before noon. That material fact was and remains undisputed. Having a disability that prevents her from starting her school day before noon does not mean A.J.T. must sacrifice her need for a full school day despite administrative inconvenience or a modest burden.

There is no evidence that A.J.T. *needs* anything less than a full day of school for *any* reason. The District *never* evaluated A.J.T.'s need for a full or a partial school day.

---

[1] *Osseo Area Schools v. A.J.T.,* File No. 21-cv-1453 (hereafter the administrative hearing record, or "AR"), Breningstall Testimony, Doc. 14-11 at 271-274.
[2] *Id.* at 274-277.

The special education administrative hearing conclusively established that unknown District officials made repeated decisions to provide her a fraction of a full school day for reasons entirely unrelated to and directly contrary to A.J.T.'s needs, and in direct violation of required and well-established legal standards and procedures. Those decisions were made outside of the IEP Team process, unrelated to any evaluation of her unique needs, and without discussing or considering the input of her Parents, her teachers, or her medical providers.

Dr. Joe Reichle, independent educational evaluator and intervention evaluator, testified at the special education hearing that A.J.T. needs a full day of school in order to make sufficient progress and that she performs well during competent instruction between 4:00 and 5:30 p.m.[3] All other witnesses at hearing, except an unbelievable out-of-state neurologist without personal knowledge, testified that with more instruction A.J.T. would likely make more progress.

There is no evidence that any legitimate, non-discriminatory reason exists for shortening A.J.T.'s school day and the only viable motivating cause is intentional discrimination – deliberate indifference to her need for equal treatment and participation in education. The District's excuses for shortening A.J.T.'s school day were properly recognized by the Administrative Law Judge as purely a pretext for the truth.[4]

The undisputed evidence is that A.T. and G.T. have consistently requested a full day of school for A.J.T. on a modified schedule since before enrolling her in the District

[3] Reichle Testimony, AR, Doc. 14-12 at 440-45.
[4] AR, Doc. 15 at 986-987.

in order to avoid disability discrimination and meet her needs, and that a full day was promised but never delivered. There is no dispute that this requested accommodation was repeatedly made to various District officials, including high level District administrators, and that it was a reasonable request to which the District has not raised any undue burden or fundamental alteration defense.[5] It is also undisputed that District officials to whom complaints were made had actual knowledge, and had both the authority and the duty to investigate and respond. Yet, District officials making these decisions have erected a veil of deception and ignorance hoping to shield the District from responsibility to investigate and correct the complaints of disability discrimination upon repeated notice.

All District officials testified that they have professional obligations to know the law and comply with the law, and to ensure that every disability discrimination complaint is investigated and resolved, pursuant to their licenses, position descriptions, and District policies, but that this never occurred because each claimed ignorance of the complaints. Despite their supervisory responsibilities and the obligations of each District staff reporting to them, the District's Superintendent, Special Education Director/504 Coordinator, and 504 Coordinator each disclaimed *any knowledge* of the complaints or any action taken in response. Yet, the District's own records and the credible testimony

---

[5] The District did *not* raise any undue burden or fundamental alteration defense in its Answers (Docs. 6 and 16) to the original or Amended Complaints, and those defenses are now waived. "Failure to raise an affirmative defense . . . constitutes waiver of that defense." *Childress v. Fox Associates, LLC,* 932 F.3d 1165, 1171 (8th Cir. 2019). Passing references in its Memorandum after the close of discovery are not sufficient.

of A.T. convincingly belie that position. Even *if* those District officials really did not know of the complaints, they should have known of them because District policies *require* complaints of discrimination to be reported to those very officials and investigated, and because they were obligated to supervise staff to ensure compliance.

A.J.T.'s Parents even met with the District's highest special education official, its Special Education Director Kate Emmons (also its top 504 official), on more than one occasion and complained directly to her about disability discrimination and A.J.T.'s need for a full school day. The Special Education Coordinators who announced the District's decisions to shorten A.J.T.'s school day and refusals to accommodate her need for a modified full-day schedule, *all* reported directly to Ms. Emmons. The testimony at hearing established that the District's Coordinator, Joy Fredrickson, acted for years at the direction of a source *outside of the IEP Team* as corroborated by all IEP Team members including A.J.T.'s teachers and Parents. Ms. Emmons' claims that she had limited knowledge of this dispute and the discrimination complaints are incredible given her supervisory role and duties, her meetings with A.T., G.T. and Coordinators, and the longstanding nature of this dispute involving *two* administrative hearings and *two* federal district court complaints. As the person in charge of both special education and non-discrimination, it is reasonable to conclude that Ms. Emmons personally decided to refuse to accommodate A.J.T.'s disabilities with a modified schedule. At the very least, she had knowledge of, personally participated in, or acquiesced in the District's decisions to violate A.J.T.'s right to equal educational access each year. Director Emmons told A.J.T.'s Parents to hire a personal care assistant to replace the extended school day

instruction she needed, reflecting stereotyped misperceptions of students with severe disabilities and discriminatory animus about A.J.T. as a child in need of personal care rather than a learner in need of a full education. This reflects the state of mind of the District's primary decisionmaker.

The District's shifting litany of unbelievable excuses confirm its discriminatory intent as the real motivator for the actions and inactions of its officials, providing clear evidence of deliberate indifference to A.J.T.'s rights and a gross departure from established professional standards. Despite direct, specific and repeated Parent complaints to the District that failure to provide A.J.T. a full school day is disability discrimination, documented in its own records, *no referral* to the District's 504 Coordinators, no discrimination *investigation*, no notice of parental rights, no corrective *action*, or *any response at all* was *ever* provided as required by the law and the District's own policies and procedures. Despite undisputed evidence that A.J.T. has a disability that precludes school attendance before noon, the District has deliberately chosen to deny her an opportunity to participate in and benefit from a full day of school equal to her peers without disabilities. It is important to note that the District *did concede* that A.J.T. *needs* a full school day but conditioned her enjoyment of it on starting at the opening bell contrary to her established medical treatment and advice.

District officials, including its Superintendent, its Special Education Director/504 Coordinator, and its 504 Coordinator – high level officials in charge of ensuring compliance with these important legal obligations - each claimed ignorance of the discrimination complaints and the lack of any District response, or even *any knowledge*

of the dispute. These claims are not credible given: 1) the specific professional licensing obligations of each official to know and comply with the IDEA, Section 504 and the ADA; 2) the specific position descriptions of each official that require them to know and comply with the IDEA, Section 504 and the ADA and to supervise and ensure compliance by other staff including Coordinators; 3) the specific District policies requiring investigation, parental notice of rights, and correction of *any* discrimination complaint, formal or informal, written or verbal, by *every* District employee; and 4) the documentation of disability complaints and credible testimony of A.T. that he met with and communicated directly with various Coordinators, the Superintendent and Special Education Director/504 Coordinator about the complaints. Ignoring their professional responsibilities and District policies they were charged to enforce, as well as actual knowledge of the complaints, these actions provide unequivocal evidence of six years of repeated, deliberate choices to turn away from those responsibilities, and to knowingly discriminate against A.J.T. and retaliate against her Parents.

In the absence of any truth to the District's excuses for not providing A.J.T. the same amount of instruction as provided to her peers, the only plausible explanation for its indifference - even hostility - is that its officials decided on a course of unequal treatment of A.J.T. knowing that it would violate her rights to equal access because its officials wrongly exalted the District's standard workday over her disability-related need for a modified schedule and considered A.J.T. unworthy of the extra effort required to modify her school day. These actions establish deliberate indifference. Then those same officials decided on a further course of punishment for her Parents' continued advocacy

to meet A.J.T.'s disability-related need for a modified schedule when its tactics failed to coerce A.J.T.'s family into abandoning advocacy, and resisted, refused to cooperate, refused to be transparent, were disrespectful, created staffing inconsistencies, created unreliable records of her performance and seizures, and froze historically cooperative communications between school staff and her Parents. As the District failed in two due process hearing attempts, its retaliatory treatment of A.T. and G.T. escalated noticeably. Rather than correct and reverse course, the District doubled down through active retaliation that has ruined what should be a cooperative IEP Team process and the quality of A.J.T.'s education. These actions establish retaliation.

As a result, A.J.T. has not received a full school day equal to her peers solely on the basis of her disability because the District has unreasonably refused to provide the accommodation in scheduling she needs and then ignored and punished her Parents' complaints without taking *any* investigative or corrective action. She and her family have suffered and continue to suffer significant compensable harm until the District's discrimination is permanently enjoined and they are fully compensated.[6]

## STANDARD OF REVIEW

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. Rule 56(a). A disputed fact is 'material' if it might affect the

[6] *See,* Affidavit of Aaron Tharpe, ¶¶ 51-54.

outcome of the case, and a factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[7] Summary judgment is improper where a defendant has not met its burden to negate a plaintiff's allegations, and evidence, including inferences to be drawn from underlying facts, must be viewed in the light most favorable to the opposing party.[8]

Summary judgment should seldom be used in discrimination cases because they "often depend on inferences rather than on direct evidence [and] summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant."[9] "Summary judgment is appropriate only in 'those rare instances where there is no dispute of fact and where there exists only one conclusion.'"[10] The legitimacy of proffered reasons for adverse action and determination of pretext "is a factual dispute whose resolution will depend significantly on credibility" rendering summary judgment inappropriate.[11]

Each of Plaintiffs' allegations from the Amended Complaint[12] remain at best undisputed in their favor, and at worst in genuine dispute. The evidence from the administrative hearing, pleadings and discovery demonstrates that every material fact asserted that is necessary to determine Plaintiffs' claims cannot be or is genuinely

---

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[8] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).
[9] *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994).
[10] *Id.*, quoting *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991).
[11] *Id.* at 1341-42.
[12] Doc. 15.

disputed, and Defendants have failed to demonstrate the absence of a genuine issue of material fact supporting entry of summary judgment against the Plaintiffs. Fed. R. Civ. Proc. Rule 56(c). The evidence creates at least a genuine issue for trial. Defendants are not entitled to summary judgment. Weighing the facts most favorable to the non-moving party, it would also be reasonable for the Court to enter summary judgment in favor of Plaintiffs as to both liability and damages[13] because the Defendants have failed to establish any genuine dispute as to any fact material to those determinations. Fed. R. Civ. Pro. Rule 56(f)(1).

## STATEMENT OF FACTS

Since she was in preschool, A.J.T. has been treated for intractable epilepsy including a morning care and treatment regimen precluding morning activities in order to reduce seizures.[14] In Kentucky A.J.T. received a full day of school on a modified schedule starting at noon and ending at 6:00 p.m., and her Parents requested – and the District agreed - to provide the same school schedule when relocating to the District in October 2015.[15] After moving to the District its officials decided, without ever evaluating A.J.T., entirely unrelated to her unique needs, and outside of any IEP Team process, that it would not provide her a full day of school, because it was prohibited from

[13] The District has not contested the damages claim and, once liability is established, judgment should be entered in Plaintiffs' favor.
[14] Affidavit of Aaron Tharpe, ¶¶ 2-5.
[15] *Id.* at ¶¶ 6-15.

doing so, it was not required to do so, or it would create a precedent it wanted to avoid.[16] Over six years the District offered only 3.25 hours, 4.25 hours, or 2.33 hours – each time again without any evaluation of *her need* for less than a full school day, unrelated to her needs for intensive services, and outside of the required IEP Team process - and would only offer to provide a full 6.5 hour school day on the standard schedule including mornings when A.J.T. was medically unable to attend school.[17]

From October 2015 to the initiation of this claim, A.T. and G.T. have repeatedly complained to District officials, including its Coordinators and Special Education Director/504 Coordinator, that the refusal to provide a school day equal to her peers discriminated against A.J.T. on the basis of disability.[18] Not once did any District staff or administrator inform A.T. and G.T. of their rights, its complaint investigation Policy or duties, or ensure that any complaint was investigated and resolved.[19] Despite communications and meetings with District officials, including its Coordinators, Superintendent and its Special Education Director/504 Coordinator when A.T. and G.T. complained of disability discrimination against A.J.T., each District official disclaims knowledge of the complaints.[20] Each District official *did* testify to established professional standards, including licensing obligations and position descriptions that require knowledge of the laws that prohibit disability discrimination, and of their

[16] *Id.* at ¶¶ 17-32.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Deposition of Kate Emmons, Ex. G to Goetz Affidavit; and Tharpe Affidavit.

professional obligations to ensure compliance with District policies that *require* reporting, investigation, notice to parents of rights, and correction of disability discrimination complaints, written or verbal, formal or informal.[21]

Kate Emmons was the District's Director of Student Services and Section 504 Coordinator during the course of the discrimination and retaliation but did not read any relevant educational records except "an occasional Prior Written Notice" and "an IEP several years ago" that she could not identify.[22] She claims responsibility to afford students an opportunity for but not equal access to learning, and could not identify anyone in the District responsible to ensure equal access to learning.[23] Ms. Emmons is responsible to plan, supervise and coordinate special education and Section 504.[24] The Section 504 Coordinator reports to her.[25] As supervisor it is her job to monitor programs for compliance with laws and policies.[26] It is her job to serve as a conciliator to resolve special education disputes and she attended a conciliation conference with A.T. and G.T.[27] It is her job to stay current on all education laws and rules.[28] It is her job to ensure the effective identification and assessment of and provision of student services to students who are disabled or have special needs under the IDEA and Section 504.[29]

---

[21] *Id.*
[22] Ex. G, 6-7 at 23-6.
[23] *Id.*, 7-8 at 23-9.
[24] *Id.*, 14 at 6-16.
[25] *Id.* at 23-25.
[26] *Id.*, 16 at 17-21.
[27] *Id.*, 17 at 1-25.
[28] *Id.*, 19-20 at 24-17.
[29] *Id.*, 20-21 at 18-10.

Regular check-ins and reviews with her supervisor do not include a review of compliance with her job description because that is assumed.[30] It is the Assistant Superintendent's job to make sure she is doing her job correctly.[31]

Ms. Emmons supervises Coordinators to "provide guidance and support, and correction as needed" and to ensure that they comply with policies, procedures, laws and rules.[32] It is the professional responsibility of Coordinators to follow laws, policies and procedures but her supervision does not include ensuring their compliance other than responding to their particular questions.[33] It is her job and everybody's job to ensure District compliance with the IDEA and to report noncompliance.[34] She has not been trained in Section 504 for "a while" but depends on the 504 Coordinator to "brief" her.[35]

Section 504 evaluation and eligibility forms are to be provided to parents before conducting an evaluation and upon qualification, she does not know that forms were provided to A.T. and G.T., but A.J.T. was eligible under Section 504 when she qualified for an IEP.[36] Ms. Emmons testified that "Section 504 is access and opportunity and IDEA is progress. You need to make progress. It's hard to make progress if you don't have access and opportunity."[37] It is her job to ensure compliance and everybody's

---

[30] *Id.*, 21-23 at 18-7.
[31] *Id.*, 23-25 at 8-17.
[32] *Id.*, 25-26 at 20-19.
[33] *Id.*, 26-28 at 17-10.
[34] *Id.*, 29-31 at 21-5.
[35] *Id.*, 31-32 at 8-3.
[36] *Id.*, 34-36 at 19-12.
[37] *Id.*, 36 at 19-24.

responsibility to comply with Section 504.[38] It is the responsibility of everybody and anybody who is aware of noncompliance with Section 504 to report it.[39] She is not trained in the ADA and testified that Section 504 is one section of the ADA.[40] She could not identify any difference between the IDEA and the ADA, but everybody is responsible to comply with the ADA and to report noncompliance.[41]

Ms. Emmons knows the District's nondiscrimination policy that requires complaints be reported to the Section 504 Coordinator, identified in the policy as Ms. Emmons.[42] Ms. Emmons reports the District's compliance with Section 504 annually to the Minnesota Department of Education as its Section 504 Coordinator in order to receive federal funds.[43] The District's organizational core value is that everyone has equal intrinsic value including A.J.T.[44] The District's Policy 102 prohibits disability discrimination, and its purpose is to establish and maintain a learning environment that affords *equal* educational opportunities, free from discrimination.[45] It is her responsibility to ensure compliance and everybody's responsibility to comply.[46] Yet, she could not define the term "equal" when used in the context of disability discrimination, and disagreed that it means "equal to peers without disabilities," "of the same measure,

---

[38] *Id.*, 41-42 at 20-12.
[39] *Id.*, 44-45 at 25-14.
[40] *Id.*, 45-46 at 15-4.
[41] *Id.*, 46-47 at 15-12.
[42] *Id.*, 47-49 at 13-17.
[43] *Id.*, 51-54 at 13-4.
[44] *Id.*, 54-55 at 16-24.
[45] *Id.*, 55-56 at 25-8.
[46] *Id.*, 56-57 at 9-2.

quantity, amount or number as another," "identical in mathematical value," or even "the same."[47]

Ms. Emmons testified that A.J.T. was provided an equal opportunity to be educated with less than a full school day because the District did not pursue truancy charges due to her medically-excused morning absences and provided intense services.[48] She testified that the provision of intense services is no reason to shorten a student's school day.[49] She was told of A.J.T.'s shortened school day and intense services from a Coordinator.[50] She agreed it would have done no good to pursue a truancy action.[51] She did agree that "equal" means "the same."[52] A full school day for A.J.T.'s peers is 6.5 hours.[53] She testified that A.J.T. can make progress in a shortened day but could not identify the basis for that opinion but she was told the IEP Team decided this "quite a long time ago."[54] She also testified that she did not know who decided what time A.J.T.'s school day would end.[55] She testified that she "guessed" that A.J.T. was getting the supports and services she needed and that her IEP Team decided on her shortened school day.[56] The only reason A.J.T. was not provided a modified full-day schedule was that she was medically unable to start school before noon and her part-time program was

[47] *Id.*, 95-96 at 8-15.
[48] *Id.*, 57-58 at 9-14.
[49] *Id.*, 163-64 at 11-4.
[50] *Id.*, 58-60 at 15-2
[51] *Id.*, 60 at 1-8.
[52] *Id.*, 60 at 9-25.
[53] *Id.*, 63 at 3-5.
[54] *Id.*, 63-64 at 6-23.
[55] *Id.*, 76 at 13-17.
[56] *Id.*, 97 at 1-14.

intended to produce progress.[57] She knew nothing about what A.J.T.'s teachers thought of the shortened school day but knew her Parents objected.[58] She has not discussed A.J.T.'s unequal, shortened school day with anyone but counsel.[59] The only basis to shorten a child's school day is that child's individual needs.[60]

Ms. Emmons testified that every student enrolled in the District is presumed to receive a full day of school, there is no requirement to establish the need for a full school day, and no discussion of altering a school day unless an individual child needs it.[61] She testified that progress is not a reason to cut the school day short for a special education student.[62] Shortening a student's school day must be based on individual needs and ability to participate, such as a student with cancer too sick to attend school full-time.[63] If a student is medically unable to attend school then an individual plan must be developed under Section 504 or the IDEA.[64]

Ms. Emmons testified that she did not know that there are school age students in programs, services, or activities outside of the standard school day but then identified that students are involved in athletics, community education, and homebound instruction.[65] The District provides homebound instruction to students medically unable to attend

---

[57] *Id.*, 66 at 1-13.
[58] *Id.*, 68 at 11-18.
[59] *Id.*, 69 at 20-25.
[60] *Id.*, 162 at 16-19.
[61] *Id.*, 108 at 1-22; 256 at 11-13.
[62] *Id.*, 109 at 5-8.
[63] *Id.*, 109-111 at 9-18.
[64] *Id.*, 112-113 at 19-16.
[65] *Id.*, 79-80 at 17-21.

school for a minimum of one hour per day but tailored to the needs of students on IEPs.[66] She does not know of any other student in the District provided less than a full school day.[67] She knows that the IDEA defines "school day" as being the same for all students.[68]

District Policy 102 requires an investigation of all complaints of disability discrimination, whether formal or informal, verbal or written but she was not aware of any investigation regarding A.J.T.[69] The Policy requires notice to complainants of the process to file a complaint but she was not aware of any notice provided to A.T. or G.T.[70] The Policy requires notice to complainants that retaliation is prohibited but she was not aware of any notice provided to A.T. or G.T.[71] The Policy requires assurances to complainants of appropriate corrective and remedial actions for violations but she was not aware of any notice provided to A.T. or G.T.[72] The Policy requires notification to complainants of the right to file complaints with other state and federal agencies but she was not aware of any notice provided to A.T. or G.T.[73] The Policy defines the term "discrimination" to mean "to treat a person in a disparate manner because of that person's disability" and she knows that "disparate" means "different."[74]

---

[66] *Id.*, 81-82 at 8-21.
[67] *Id.*, 84-86 at 13-1.
[68] *Id.*, 87-89 at 5-2.
[69] *Id.*, 70-71 at 20-5.
[70] *Id.*, 71-72 at 6-5.
[71] *Id.*, 72 at 10-15.
[72] *Id.*, 72-73 at 16-7.
[73] *Id.*, 73 at 8-14.
[74] *Id.*, 74 at 19-25; 94 at 6-16.

Ms. Emmons testified that Section 504 imposes clear duties of accommodation, and provides an equal opportunity to participate in school, but did not know if it requires equal treatment of students with disabilities or an equal opportunity to benefit.[75] She knows that the ADA guarantees equal access to services, programs and activities without discrimination but does not know that it guarantees equal benefits from that access.[76] She understands that discrimination under Section 504 and the ADA means "treating someone differently based on their disability" or failing to provide individual accommodations to provide access.[77] She also understands that Section 504 and the ADA require accommodations or modifications if a student needs them in order to have equal access to services, programs or activities.[78]

Ms. Emmons agreed that she met with A.T. on two occasions regarding A.J.T.[79] She knew that A.T. and G.T. were requesting a full school day for A.J.T. starting at noon.[80] She never read or discussed with anyone the letters from A.J.T.'s treating neurologists regarding the medical need to start school at noon and receive a modified schedule but did not question them.[81]

Ms. Emmons testified that Coordinator Stafford told A.T. and G.T. in an IEP Team meeting upon their move from Kentucky that that "we don't provide both

---

[75] *Id.*, 89-90 at 8-17.
[76] *Id.*, 90-92 at 18-24.
[77] *Id.*, 92-93 at 25-15.
[78] *Id.*, 93-94 at 16-5.
[79] *Id.*, 124 at 5-19.
[80] *Id.*, 142-143 at 15-6; 145 at 2-6.
[81] *Id.*, 149-160 at 13-11.

homebound and school support modified," but that the District's Total Special Education System promises MDE that students can have a combination of alternate methods of instruction, including homebound and in-person instruction.[82] She recognized A.T.'s statement of the District's position conflicting with the ADA as a complaint of disability discrimination.[83] The District's only response to that complaint was to suggest that A.T. look at the law.[84] She testified that the refusal to provide A.J.T. with a full school day was made before A.J.T. started school or was evaluated.[85] She testified that the District decision to deny A.J.T. a full school day because "state law does not mandate this support" was not true and had she known about that excuse would have corrected it.[86] She did not know that A.J.T.'s IEP Team ever determined a shortened school day was required in order to address her unique disability-related needs.[87] Progress is not a reason to shorten a student's school day.[88] She also testified that the District's excuse for refusing to provide A.J.T. a full school day on June 6, 2016 due to "the precedent it would start" was obviously not related to A.J.T.'s needs.[89]

Over the past six years A.T. and G.T. have annually provided letters from A.J.T.'s neurologists requesting a modified school schedule on the basis of her disabilities, and annually signed authorizations to release information permitting the District unlimited

---

[82] *Id.*, 174-77 at 15-13.
[83] *Id.*, 177 at 14-21.
[84] *Id.*, 205-8 at 9-12.
[85] *Id.*, 181-183 at 23-15.
[86] *Id.*, 193-96 at 14-6.
[87] *Id.*, 199 at 15-18.
[88] *Id.*, 225 at 11-14.
[89] *Id.*, 249-50 at 4-1.

access to A.J.T.'s neurologists to understand her disabilities and needs.[90] Over the past six years A.T. and G.T. have diligently attempted to work cooperatively with District officials to resolve the ongoing disability discrimination without resort to litigation.[91] Those efforts have come at a tremendous cost to A.J.T. and her family in lost educational access and benefits, delayed access to needed assistive technology, and significant investment of time and money to defend against the District's due process hearing, then pursue their own due process hearing and this claim with all of the attendant expert and legal costs.[92]

Over the past six years, District officials became increasingly hostile to A.T. and G.T., engaging in the following adverse actions: 1) repeatedly refused to investigate or respond in any way to discrimination complaints knowing that inaction would violate professional standards and A.J.T.'s right to equal treatment; 2) started an administrative hearing against A.T. and G.T. to further reduce A.J.T.'s school day that was withdrawn once a legal defense was raised; 3) refused to implement the sound and uncontested recommendations of an independent educational evaluator for more and better instruction and assistive technology; 4) refused to solicit or consider the opinions of her teachers and medical providers about the length of her day; 5) told A.T. and G.T. to hire a personal care attendant during the missing school hours; 6) missed significant amounts of instruction and assistive technology ordered to be provided; 7) then created unreliable

[90] Tharpe Affidavit at ¶¶ 3-7.
[91] *Id.* at ¶¶ 12-32.
[92] *Id.* at ¶ 50.

data based on half-hearted efforts, and faulty data collection and analysis methods; and 8) directed its staff to stop communication or cooperating with them.[93] A.J.T., A.T. and G.T. have suffered significant damages from the District's discrimination and retaliation that should be fully remediated.[94]

A five-day special education administrative hearing was conducted and decided in favor of A.J.T. and her Parents, properly exhausting administrative remedies.[95] That record established a significant proportion of the facts that are material to the discrimination claims, and discovery provided additional material facts on which Plaintiffs rely.

## ARGUMENT

The District rests its motion for summary judgment on three faulty arguments. First, it asserts that a unilaterally shortened school day, that was both unrelated to and contrary to her individual needs, did not effectively exclude A.J.T. from or deprive her of the equal benefit of its programs, services, or activities.[96] It argues essentially that 65% of a school day is equal to 100% of a school day. Second, it argues that when its officials claimed ignorance of complaints and failed to fulfill settled duties to investigate and respond by ignoring them entirely, the District cannot have intended to discriminate.[97] Its

---

[93] *Id.* at ¶¶ 33-54.
[94] *Id.* at ¶¶ 52-54.
[95] AR, Doc. 15, 967-989.
[96] Defendants' Memorandum, Doc. 34 at 12.
[97] *Id.*

argument amounts to a defense that ignorance and inaction create a shield from liability for refusal to fulfill settled duties. Third, it argues that the actions of its officials in response to protected parental advocacy are not sufficiently adverse to establish retaliation.[98] Its position is that, as hard as the District made it for A.T. and G.T., they did not stop their advocacy so it could not have been so bad. Each claim is resolved in Plaintiffs' favor on undisputed facts or at least disputed, requiring trial.

## I. EQUAL TREATMENT IS AT THE CORE OF NONDISCRIMINATION

Section 504 of the Rehabilitation Act and Title II of the ADA prohibit disability discrimination in public schools. Section 504 requires "[n]o otherwise qualified individual with a disability . . . shall . . . be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ."[99] The ADA "prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity."[100] The rights and remedies under Section 504 and the ADA are the same.[101] The touchstone of nondiscrimination for students with disabilities is *equality* **-** treatment and access that is *equal* to students without disabilities.[102] "Section 504 is a proscriptive, anti-discrimination statute that

---

[98] *Id.* at 26.
[99] *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000).
[100] *Id*, quoting *Randolph v. Rodgers*, 170 F.3d 850, 857 (8th Cir. 1999).
[101] *Id.* at 856.
[102] Section 504 and ADA regulations specify that opportunities to participate and benefit must be "equal to that afforded to others", "as effective as those provided to others", not

prohibits discrimination on the part of governmental actors to avoid due process and equal protection violations."[103] Enforcement, remedies, and rights are the same under both Title II of the ADA and the Rehabilitation Act.[104]

Section 504 required the District to make an individualized, pre-placement evaluation of A.J.T.'s specific needs[105] and prohibited it from basing its placement decision on a blanket policy or administrative convenience.[106] One of the key non-discrimination principles underlying Section 504 is that recipients may not provide persons with disabilities different benefits or services unless *necessary* to provide equally effective services[107] because "the needs of the handicapped person are determinative as to proper placement."[108] The Department of Education made clear that "[t]he overriding rule regarding placement is that placement decisions must be made on an individual basis," and that such decisions "may not be based on category of disability, the configuration of the delivery system, the availability of educational or related services, availability of space, or administrative convenience."[109] The

---

unnecessarily different from that provided to others, and that "all the rights, privileges, advantages and opportunities enjoyed by others" are not limited. 34 C.F.R. § 104.4(b) and 28 C.F.R. § 35.130. "Discrimination" is defined as "differential treatment; esp. a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." Black's Law Dictionary, Eighth Ed., Thomson West (2004).

[103] *M.P. v. Ind. Sch. Dist. No. 721*, 439 F.3d 865, 867 (8th Cir. 2006).

[104] *Birmingham*, 220 F.3d at 856.

[105] 34 C.F.R. § 104.35.

[106] 34 C.F.R. § 104.34.

[107] 34 C.F.R. § 104.4(b)(iv).

[108] 34 C.F.R. Pt. 104, App. A, Subpt. D, No. 24 at 408.

[109] 57 Fed. Reg. 49, 274-5 (Oct. 30, 1992).

administrative hearing demonstrated the District's violations of these explicit requirements.

The "normal definition of discrimination" is "differential treatment"[110] Discrimination means "less favorable" treatment.[111] "'Discrimination' is a term that covers a wide range of intentional unequal treatment."[112] Section 504 requires that, in order to avoid discrimination and "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."[113] "Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance."[114] Similarly, the ADA requires reasonable modifications in policies when necessary to avoid disability discrimination.[115] "Congress intended Title II and its implementing regulations to be consistent with the Rehabilitation Act and its regulations."[116]

To prevail on a claim of Section 504 disability discrimination, a plaintiff must prove that she "(1) is a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was

---

[110] *Olmstead v. L.C.*, 527 U.S. 581 (1999).
[111] *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, n. 22 (1983).
[112] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).
[113] *Alexander v. Choate*, 469 U.S. 287, 301 (1985).
[114] *Id.* at 304.
[115] *DeBord v. Board of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1105 (8th Cir. 1997).
[116] *Id.*

discriminated against based on her disability."[117] The parties do not contest the first two elements but the third element is the crux of this dispute and is in significant dispute. The Eighth Circuit has long recognized that reasonable accommodations may be required under Section 504 to ensure that students with disabilities are not denied meaningful access to a benefit or service, and reasonable modifications are required when necessary to avoid discrimination under the ADA.[118] An issue of fact as to whether a school has denied a student with disabilities an opportunity equal to that of his classmates without disabilities precludes summary judgment.[119] The Court in *Argenyi* cited with approval a decision from the Ninth Circuit that the ADA "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'"[120] And, the Court has clearly determined that equal access means equal opportunity, so that limited access by deaf patrons to captioned performances was unequal to the access provided to patrons without disabilities, denied them meaningful access, and was discriminatory.[121]

The Supreme Court's decision in *Fry*[122] on exhaustion of administrative remedies provides a good understanding of the distinctions between the IDEA and 504/ADA and confirms that non-discrimination in education for students with disabilities is concerned

---

[117] *Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971 (8th Cir. 1999).
[118] *Davis v. Francis Howell Sch. Dist.*, 138 F.3d 754, 756 (8th Cir. 1998).
[119] *Argenyi v. Creighton University*, 703 F.3d 441, 449 (8th Cir. 2013)(Section 504 does not require aids and services to produce the identical result or level of achievement for students with and without disabilities, "but they nevertheless 'must afford handicapped persons equal opportunity to . . . gain the same benefit'").
[120] *Id.*, quoting *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).
[121] *Childress*, 932 F.3d at 1171.
[122] *Fry v. Napolean Community Schs.*, 137 S.Ct. 743 (2017).

with *equal treatment*. First, § 1415 "makes clear that nothing in the IDEA 'restrict[s] or limit[s] the rights [or] remedies' that other federal laws, including antidiscrimination statutes, confer on children with disabilities."[123] As important as the IDEA is for children with disabilities, "it is not the only federal statute protecting their interests" but exists alongside the ADA and Section 504 that require modifications to policies, practices and procedures to avoid discrimination.[124] "A school could offer a FAPE to a child with a disability but still run afoul of the law's ban on discrimination."[125] The only relief available under the IDEA is for denial of a FAPE[126] which is insufficient to address the District's disability discrimination, and important remedial relief, namely injunctive and damages, are necessary to secure A.J.T.'s rights to both a FAPE and an education free from discrimination. "A school's conduct toward such a child – say, some refusal to make an accommodation – might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA."[127] The ADA and Section 504 "aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs."[128] An ADA claim is unique as "its essence is equality of access to public facilities, not adequacy of special education."[129]

[123] *Id.* at 748.
[124] *Id.* at 749.
[125] *Id.* at 751.
[126] *Id.* at 752.
[127] *Id.* at 754.
[128] *Id.* at 756.
[129] *Id.*

The Supreme Court is clear that reasonable accommodations by definition require preferential treatment of persons with disabilities.[130] "By definition any special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the 'reasonable accommodation' provision could not accomplish its intended objective."[131]

All existing authorities have consistently determined that providing a shorter school day to a student with disabilities is discriminatory, unless her unique needs *require* a shorter day. Ignoring the right to equal treatment and making decisions to shorten the school days of students with disabilities has long been recognized as discrimination. The U.S. Department of Education, Office of Special Education and Rehabilitation Services, has issued long-standing and unequivocal guidance to the field on this topic, entitled to deference by hearing officers and courts.

> In general, a school day for a child with a disability should not be longer or shorter than a school day for general education students. However, if a child's IEP Team determines a child needs a shorter or extended school day in order to receive FAPE, then appropriate modifications should be incorporated into the IEP. However, these modifications must be based on the unique needs of the child, as determined by the IEP Team . . .[132]

*Every* decision and guidance on this issue from the U.S. Department of

---

[130] *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002).
[131] *Id.*
[132] *Questions and Answers on Serving Children with Disabilities Eligible for Transportation*, 53 IDELR 268 *8 (OSERS 2009).

Education, Office for Civil Rights,[133] has concluded that public schools discriminate against students with disabilities in violation of Section 504 and/or the ADA when providing a shorter school day than provided to students without disabilities, unless an individual student's unique needs *require* a shortened school day.[134] "Administrative

[133] OCR enforces Section 504 and Title II that prohibit school districts from providing students with disabilities inferior opportunities to participate in, or benefit from, a benefit or service that is provided to nondisabled students. 34 C.F.R. § 104.4(b)(1)(ii) and 28 C.F.R. § 35.130(b)(1).

[134] *Alleghany County (NC) Schs.*, 69 IDELR 193 (OCR 2016)(unilateral decision to shorten school day without IEP Team discussion and reevaluation is discrimination); *Gwinnett County Sch. Dist.*, 67 IDELR 158 (OCR 2015)(students with disabilities must receive the same amount of instruction as nondisabled students unless an IEP or 504 Team has made an individualized determination that a student *requires* a shortened or lengthened school day to make educational progress); *Rye City Sch. Dist.*, 115 LRP 50578 (OCR 2015)(school districts may not provide students with disabilities a shorter school day than students without disabilities unless their IEP or Section 504 plan *requires* it based on individual needs, and not for administrative convenience); *Arcadia Unified Sch. Dist.*, 115 LRP 17613 (OCR 2014)(a shortened school day is only appropriate if *necessary* to ensure a FAPE *regardless of schedules* or transportation arrangements, a decision that must be based on the individual needs of a specific student; a reduction of *five minutes per day* was disability discrimination); *Palm Springs Unified Sch. Dist.*, 61 IDELR 174 (OCR 2013)(predetermined shortened school day is disability discrimination absent an individualized determination that a student *needs* less than a full school day based on an evaluation of his needs); *Alabama State Dept. of Educ.*, 59 IDELR 297 (OCR 2012)(shortening the school day of students with disabilities is only appropriate if an IEP or Section 504 Team determines that reduced instructional time is *necessary* to meet the student's individual needs; shortening a child's school day simply because of administrative convenience is never appropriate); *Castaic (CA) Union Ele. Sch. Dist.*, 58 IDELR 234 (OCR 2011)(shortening school day and instructional time by 36 minutes a day for students with mobility impairments to improve bus safety is pretext for disability discrimination and denies a FAPE when not *individually necessary*); *Pleasanton Unified Sch. Dist.*, 39 IDELR 190 (OCR 2003)(shortening the school day for special education student was not educationally justified or supported by an IEP Team decision; decisions "may not be based on administrative convenience or categorical determinations based on a student's particular disability status"); and *Miami-Dade County Pub. Sch. Dist.*, 36 IDELR 107 (OCR 2001)(special education students cannot be denied a school day comparable in length to the school day provided to regular education students, unless a shortened day is educationally appropriate). Decisions earlier than the past twenty (20)

convenience is never an excuse for shortening the instructional time students with disabilities receive."[135] An individualized determination of the need for a shortened school day must be based on an individual evaluation and determination of its appropriateness and impact, not generalized beliefs about the types of activities that are appropriate.[136] The District has not and cannot provide contrary authority.

*Every* state complaint, due process hearing, or court to consider the issue has concluded that public schools violate the rights of students with disabilities in violation of Section 504, the ADA, and/or the IDEA when providing a shorter school day than that provided to students without disabilities unless *the child's IEP Team has determined* that an individual student *needs or requires* a shorter school day in order to receive a free appropriate public education based upon an individualized determination of his or her unique needs.[137] The District has not and cannot provide

---

years have been omitted here though issued earlier on point and consistent with later decisions.

[135] *Rye City Sch. Dist.*, 115 LRP 50578 at * 3.

[136] *Palm Springs Unified Sch. Dist.*, 61 IDELR 174 at *6 (OCR 2013).

[137] *Spring Branch Ind. Sch. Dist. v. O.W.*, 938 F.3d 695, 711 (5th Cir. 2019)(shortening a school day by almost half "was a substantial and significant deviation from the IEP which indisputably resulted in a loss of educational benefits" and when accomplished outside of the required IEP Team process violated the IDEA); *Christopher S. v. Stanislaus Cty. Off. Of Educ.*, 42 IDELR 30 (9th Cir. 2004)(school engaged in disability discrimination by dismissing all autistic students at noon on Tuesdays, not based upon individual student needs decided through the IEP Team process, but only for administrative convenience based on staffing); *Teague Ind. Sch. Dist. v. Todd L.*, 999 F.2d 127, 129 (5th Cir. 1993)(shortened school day was appropriate only because it was determined by his IEP Team in response to "Todd's inability to tolerate a longer school day without becoming unduly frustrated and discouraged, leading to regression rather than academic progress" and *not for the convenience of school staff*); *Christopher M. v. Corpus Christi Ind. Sch. Dist.*, 933 F.2d 1285, 1288, 1290 (5th Cir. 1991)(part-time school day was proper only when the *IEP Team determined the student's needs* dictated

a reduced schedule to avoid "hyperextension, sweating, turning blue, breathing distress, ad extreme fatigue" triggered by prolonged stimulation); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618 (6th Cir. 1990)(limited home instruction was appropriate for student only because he could not safely tolerate a full day at school); *Timms v. Metropolitan Sch. Dist. of Wabash Cty.*, 722 F.2d 1310 (7th Cir. 1983)(part- time program was appropriate only when increased instruction resulted in increased self-abuse); *Doe v. Gonzales*, 793 F.2d 1470 1491 (9th Cir. 1986)(reduction in school day is valid only "if it is contemplated by the child's IEP and tied to valid educational goals" and the need for legitimate flexibility in IEPs "cannot be a tool for circumventing the [IDEA]'s protections"); *J.N. v. Oregon Dept. of Educ.*, 2020 WL 5209846 (D. Ore. 2020)(IDEA's placement procedures are violated when a school district decides to shorten a student's school day outside an IEP Team meeting and unrelated to student's needs, and Section 504 and the ADA guarantee equal access to public education); *Albuquerque Pub. Schs. v. Sledge*, 74 IDELR 290 (D. N.M. 2019)(school district denied student a FAPE by refusing to provide home instruction consistent with the student's seizure treatment regimen); *K.F. v. Francis Howell R-III Sch. Dist.*, 49 IDELR 244 (E.D. Mo. 2008)(a school district's routine early dismissal of a student with disabilities three hours earlier than non-disabled students resulted in disability discrimination); *In re: Student with a Disability*, 77 IDELR 27 (WI SEA 2020)(IDEA permits a shortened school day only if required to address the student's needs and only after considering alternatives to meet the student's needs, including the use of supports and services or other placement options); *In re: Student with a Disability*, 76 IDELR 229 (WI SEA 2020)(only a student's IEP Team may shorten the school day based on the student's unique disability-related needs after ruling out other ways to meet the student's needs, justifying the determination in the IEP, increasing the frequency of progress monitoring, and planning for return to full-time instruction); *In re: Student with a Disability*, 118 LRP 29605 (MN SEA 2018)(a shortened school day decision must be made by the student's IEP Team based upon the *student's individual needs that require a shortened day* and documented in the IEP, and cannot be based on a school district's choice for administrative convenience); *Pearland Ind. Sch. Dist.*, 117 LRP 43105 at *14 (TX SEA 2017)(a school district denied a FAPE when its placement decision limited the hours of instruction but was not based on an individual educational or medical need; instead "[t]he decision was arbitrary and not based upon any assessment or performance data and impeded Student's academic and non-academic progress"); *Hillsborough Cty. Sch. Dist.*, 118 LRP 11154 (FL SEA 2017)(under IDEA, a school district may only alter the length of the student's school day if necessary to provide a FAPE, and modifications must be based on the needs of the child); *In re: Student with a Disability*, 70 IDELR 137 at * 2 (WI SEA 2017)("Students with disabilities must attend school for the same number of hours and minutes as non-disabled students, unless a student's IEP team determines otherwise based on a student's unique, disability-related needs"); *Dixie Ele. Sch. Dist.*, 115 LRP 10498 (CA SEA 2015) (decisions based on adult availability were insufficient to justify that a shortened day schedule was required to provide a FAPE); *Webb Consol. Ind. Sch.*

contrary authority.

The IDEA requires that the school day be the same for students with and without disabilities.[138] Minnesota law establishes minimum hours of full-time instruction for every student,[139] requires compliance with Section 504 and the ADA,[140] requires the provision of "full services" to special education students,[141] and establishes a presumptive entitlement to a normal school day for students receiving care and treatment outside of school as the minimum service required, to be coordinated.[142]

## II. IGNORING DISCRIMINATION *IS* DELIBERATE INDIFFERENCE

Intent to discriminate should not be required in order to make out a failure to accommodate claim for disability discrimination in elementary or secondary education

---

*Dist.*, 43 IDELR 25 (TX SEA 2004)(IDEA violated when school shortened the school day to accommodate the scheduling needs of the teacher; "Progress in a drastically curtailed educational program is not meaningful progress"); *Augusta Sch. Dept.*, 36 IDELR 229 (ME SEA 2001)(an abbreviated-day program that was not made by the IEP Team and based on the student's needs and did not include a plan for reintegration denied him a FAPE); *Ind. Sch. District No. 623*, 31 IDELR 17 (MN SEA 1999)(under IDEA, even extended day services *in addition to a full day of school* can be appropriate, and a categorical denial of after-school services is improper); *Minneapolis Sch. Dist. No. 1*, 109 LRP 63289 (MN SEA 1998)(alterations to a student's day must be based on student needs and not administrative convenience); and *Wenger v. Carrastota Cent. Sch. Dist.*, 961 F.Supp. 416, 421 (N.D. N.Y. 1997)(shortened school day was appropriate only where severity of child's condition left him unresponsive, and prevented him from learning and incapable of benefiting from special education).

[138] 34 C.F.R. § 300.11.

[139] Minn. Stat. § 120A.41.

[140] Minn. Stat. § 125A.55.

[141] Minn. R. 3525.0300.

[142] Minn R. 3525.2325, Subds. 5 and 6.

for four reasons. First, intent is not a burden imposed by Section 504 or the ADA or their interpretive regulations. Second, that conclusion is contrary to Supreme Court precedent that intent is not a required element of disability discrimination claims.[143] Third, it is contrary to Eighth Circuit precedent that does *not* require a showing of intent in employment or post-secondary education claims for reasonable accommodations,[144] and there is no rational reason for a difference in treatment for primary and secondary education claims. Intent is only required in disparate treatment cases where a similarly situated person with a disability "is treated differently because of his disability than less- or non-disabled individuals."[145] The failure to make reasonable accommodations is a separate form of discrimination and "does not turn on the employer's intent or actual motive."[146] Under the Rehabilitation Act, a known disability triggers the duty to reasonably accommodate and, if the recipient fails to fulfill that duty, the Act is violated *regardless of whether the employer was motivated by the disability.*[147] "[D]iscrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty,

---

143 *Choate*, 469 U.S. at 295 (1985)("Discrimination against the handicapped was perceived by Congress to be most often the produce, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect.")
144 *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004)(the Rehabilitation Act compels employers to modify their requirements to enable disabled employees to have the same opportunities as their non-disabled peers); and *Mershon v. St. Louis University,* 442 F.3d 1069 (8th Cir. 2006)("We analyze claims of failure to accommodate under 'a modified burden-shifting analysis,' because discriminatory intent is not at issue"), citing *Peebles,* 354 F.3d at 766.
145 *Peebles,* 354 F.3d at 766.
146 *Id.*
147 *Id.* at 766-67.

we do not care if he was motivated by the disability."[148] Fourth, it is in conflict with a number of other Circuit Courts of Appeals decisions that proof of intent is not required in these claims.[149] The Eighth Circuit should abandon this requirement in these claims.[150]

Until then, Eighth Circuit precedent requires proof of intent in disability discrimination in any education claim, whether based on disparate treatment or failure to accommodate. However, in failure to accommodate claims the Eighth Circuit has appropriately softened the standard to prove intent, requiring only notice of the need for a reasonable accommodation and school district inaction, delay, or ineffective action.[151] Under either a disparate treatment or failure to accommodate approach, strong evidence exists that Defendants have discriminated against Plaintiffs with bad faith, gross departure from professional standards and deliberate indifference.

Intent has been variously described by the Court as evidence of bad faith, gross misjudgment, or deliberate indifference .[152] The genesis of this rule was *Monahan* concluding that, in order to avoid liability for disability discrimination, school officials must "have exercised professional judgment, in such a way as not to depart grossly from

---

[148] *Id.* at 767.
[149] *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999); *Washington v. Ind. High Sch. Athletic Ass'n Inc.,* 181 F.3d 840, 846 (7th Cir. 1999); *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003); and *Ability Ctr. v. City of Sandusky*, 385 F.3d 901, 912 (6th Cir. 2004).
[150] *See*, Weber, Mark C., *Accidentally on Purpose: Intent in Disability Discrimination Law,* 56 Boston College Law Review 1417 (September, 2015).
[151] *M.P. ex. rel. K. v. Ind. Sch. Dist. No. 721*, 326 F.3d 975, 982-83 (8th Cir. 2003).
[152] *Monahan v. State of Neb.*, 687 F.2d 1164, 1171 (8th Cir. 1982); *Hoekstra v. Ind. Sch. Dist. No. 283*, 103 F.3d 624, 627 (8th Cir. 1996); *Birmingham,* 220 F.3d at 856; *M.P.*, 326 F.3d 975 at 982-83; *M.Y. v. Special Sch. Dist. No. 1,* 544 F.3d 885, 888 (8th Cir. 2008); *B.M. v. South Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013).

accepted professional standards among educational professionals . . ."[153] This reasoning was based on the Supreme Court's analysis of professional liability and qualified immunity in another context:

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.[154]

The rule "reflects what we believe to be a proper balance between the rights of handicapped children, the responsibilities of state education officials, and the competence of courts to make judgments in technical fields.[155]

The Eighth Circuit applied this rule to constitutional and statutory claims involving bodily restraint of a student with disabilities in school, concluding that intent to discriminate can be proved by gross departure from accepted standards among educational professionals.[156] This record abounds with significant evidence of substantial departure from accepted professional judgment, practice or standards of many District officials who ignored their established duty to know about and to respond to discrimination complaints in order to satisfy this test. Ignoring six years of disability

---

[153] *Monahan*, 687 F.2d at 1171.
[154] *Id.*, quoting *Youngberg v. Romeo*, 102 S.Ct. 2452, 2462 (1982).
[155] *Id.*
[156] *Heideman v. Rother*, 84 F.3d 1021, 1032 (8th Cir. 1996)(licensed therapist recommended blanket-wrapping restraint, and if treatment was a substantial departure from professional norms, reasonable school officials had no reason to know that to be true, entitling them to qualified immunity).

discrimination complaints by A.T. and G.T. was not within the scope of professionally acceptable choices because the District's own policies expressly prohibit that response.

The District has failed to meet its initial burden to establish the absence of intent to discriminate and no defense to an insufficient showing is required.[157]

> At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment. Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues.[158]

Proof of plaintiff's prima facie case combined with sufficient evidence of pretext are sufficient to find unlawful discrimination.[159] "Proof that the defendant's explanation is unworthy of credence (i.e., pretextual) is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."[160] Summary judgment is improper where the moving party's showing does not foreclose the possibility that an intent to discriminate motivated its actions.[161] Even if any of the litany of the District's excuses for denying A.J.T. a full school day was legitimate, which was directly rejected by an administrative law judge hearing five days of evidence, and which the District has here wholly failed to establish, sufficient evidence that unlawful

[157] *Id.* at 160-1.
[158] *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004).
[159] *Id.* at 735.
[160] *Id.* at 736 quoting *Reeves v. Sanderson Plumbing Products, inc.*, 530 U.S. 133, 150 (2000).
[161] *Adickes v. S.H. Kress & Co.*, 298 U.S. at 158-9 (summary judgment improper on claim for race discrimination where movant's showing did not foreclose the possibility that police conspired with store owner to discriminate).

discrimination was at least *one* motivating factor exists and defeats its bid for summary judgment.

The Supreme Court has decided two cases of Title IX discrimination based on sexual harassment in school that require proof of deliberate indifference, characterized as notice of discrimination and a failure to adequately respond.[162] In *Gebser*, the Court determined that deliberate indifference to discrimination can be shown by receipt of actual notice of discrimination by a school authority and failure to adequately respond, demonstrating a deliberate decision not to "remedy the violation." *Id.* at 290. And, in *Davis*, the Court decided deliberate indifference to discrimination can be proved by a response by school authorities to discrimination or lack thereof that is "clearly unreasonable in light of the known circumstances." *Id.* at 648. Repeated notice of continuous discrimination and District inaction provide strong proof of deliberate indifference as defined.

Since *Monahan*, the Eighth Circuit has decided a number of cases of disability discrimination in schools relevant to the question of determining intent, apparently an elusive concept. A number of decisions have found insufficient evidence of intent to discriminate, all easily distinguishable.[163]

---

[162] *Gebser v. Lago Vista Ind. Sch. Dist*., 524 U.S. 274 (1998); and *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).
[163] *Hoekstra v. ind. Sch. Dist. 283*, 103 F.3d 624, 627 (8th Cir. 1996)(a two- to three-month delay in providing a student with disabilities her own key to the school lift while criteria for her safe and independent use was developed, did not constitute bad faith or gross misjudgment); *Thompson v. Bd. of Special Sch. Dist. No. 1,* 144 F.3d 574, 580 (8th Cir. 1998) (evidence of a professional disagreement over the proper diagnosis of a student's disability and disciplinary suspensions for dangerous behavior was insufficient

The case most instructive on this question is *M.P.* where the Court determined that a genuine issue of material fact precluded summary judgment on the question of gross misjudgment when a school district failed to address and remedy a discrimination complaint.[164] Similar claims as here were raised: failure to provide reasonable accommodations at school, failure to investigate complaints of disability discrimination, and failure to take appropriate and effective remedial measures upon notice to school authorities.[165] The Court noted that no changes were made to the student's Section 504 Plan despite the effects of the discrimination.[166] Repeated parent complaints of peer disability-based harassment to various school officials to express concerns and seek solutions were ignored without investigation or corrective action.[167] Reversing the district court's determination that M.P. failed to show the requisite discriminatory intent

---

to show bad faith or gross misjudgment); *Birmingham*, 220 F.3d at 857 (graduating a student early without notice to her parent was not bad faith or gross misjudgment where school officials acted in response to allegations of abuse by parent, determined that graduation was in her best interest so she could focus on developing independent living skills, and was consistent with court determination of competency and student's preference); *M.Y.*, 544 F.3d at 890 (a decision to deny special education transportation for extended school year (ESY) when the student's IEP reflected a determination that she was not eligible for ESY or transportation did not prove bad faith or gross misjudgment); *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Sch.*, 863 F.3d 966, 973 (8th Cir. 2017) (significant evidence that a school district took steps to provide a blind student with instructional materials and assistive devices in a timely manner, without more, did not show bad faith or gross misjudgment); *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 878-9 (8th Cir. 2020) (prompt investigation and correction of reported bullying did not create a genuine dispute of material fact as to bad faith or gross misjudgment).
.

164 *M.P. ex. rel. K. v. Ind. Sch. Dist. No. 721*, 326 F.3d 975, 982-83 (8th Cir. 2003).
165 *Id.* at 982.
166 *Id.*
167 *Id.* at 978.

under Section 504, the Court concluded that the failure to modify his Section 504 Plan, the regular contact from his parent that went unattended, proposals to alter his school day or send him to a school for troubled youth, and reneging on a promise to pay for transportation to a neighboring school showed the requisite deliberate indifference.[168] The Court rejected the school district's argument that proof of personal animosity or ill will was required.[169] These facts were sufficient to support a claim for bad faith or gross misjudgment by the school district "when it failed to take appropriate action to protect M.P.'s academic and safety interests."[170] "Under some circumstances notice of a student's disability coupled with delay in implementing accommodations can show bad faith or gross misjudgment."[171]

On the second appeal to the Eighth Circuit in *M.P. II,* the Court confirmed that M.P. was entitled to present his Section 504 claims before the court because his allegations of bad faith or gross misjudgment were adequately supported by evidence that the school district failed to provide him with accommodations at school, failed to investigate allegations of disability-based harassment, and failed to take appropriate and effective remedial measures once school authorities were put on notice of the discrimination.[172] The Court cited with approval an example of a successful 504 claim

---

[168] *Id.* at 982.
[169] *Id.*
[170] *Id.*
[171] *B.M.*, 732 F.3d at 888, citing *M.P.*, 326 F.3d at 982-83 (delay in § 504 evaluation and accommodation attributable to parent refusal to authorize despite persistent district efforts to serve the student was not bad faith or gross misjudgment).
[172] *M.P.,* 439 F.3d at 869.

from the Ninth Circuit involving a shortened school day for students with autism unrelated to their needs, very similar to this case.[173]

A plaintiff may survive a defendant's motion for summary judgment in one of two ways, either by: 1) proof of direct evidence showing a specific link between discriminatory intent and the challenged decision sufficient to support a finding that an illegitimate criterion actually motivated the action; or 2) creating an inference of unlawful discrimination through the *McDonnell Douglas* analysis,[174] including sufficient evidence of pretext.[175] Here, Plaintiffs have both. Director Emmons' negative statement denigrated A.J.T.'s need for a full education, comparing it to simply personal care and demonstrated clear discriminatory animus motivating what can only be attributed to be her supervisory decisions to deny A.J.T. a full day of instruction. As well, the evidence that District officials decided to refuse the modified schedule A.J.T. needs on account of her disabilities and contrary to established procedures, and violation of its established professional standards requiring investigation of discrimination complaints provide further direct evidence of intent. And, sufficient evidence of pretext has been established

---

[173] *Christopher S.*, 384 F.3d at 1211-12 (blanket policy to shorten school day had nothing to do with the content of individual IEPs because no individualized decisions were made to do so on a case-by-case basis that students could not tolerate a full school day, but were based on administrative convenience).
[174] *McDonnell Douglas Corp. v. Green*, 93 S.Ct. 2148 (2003)(plaintiff bears initial burden to establish prima facie case creating presumption of discrimination; burden then shifts to defendant to articulate legitimate, nondiscriminatory reason for adverse action; and burden then shifts to plaintiff to show proffered reason was merely pretext for discrimination).
[175] *Griffith v. City of Des Moines*, 387 F.3d at 736.

by the lack of truth or legitimate basis for any of the District's stated reasons to deny A.J.T. a full day of instruction.

The District's own records and statements of its officials at deposition establish accepted professional practice and standards, reflected in their licensing requirements, position descriptions and policies that governed each District decision-maker, requiring equal treatment of students with disabilities, and investigation and resolution of each complaint of discrimination. And the depositions and hearing testimony of every District official, including its Section 504 Coordinators, prove that each staff member and administrator repeatedly ignored those obligations, and substantially departed from accepted professional judgment. There can be no quarrel with the conclusion that here District officials departed grossly from accepted professional standards and caused harm far beyond the failure to provide a FAPE.

## III. HOSTILITY AND PUNISHMENT ARE RETALIATORY ACTIONS

Retaliation against persons for advocacy efforts to correct disability discrimination is expressly prohibited by Section 504 regulations[176] and the ADA regulations.[177] Retaliation against a person because of complaints of illegal discrimination is a form of intentional discrimination.[178] To establish a prima facie case of retaliation under the ADA a plaintiff must demonstrate: 1) engagement in a statutorily protected activity; 2)

[176] 34 C.F.R. § 104.61.
[177] 28 C.F.R. § 35.134.
[178] *Jackson*, 544 U.S. at 174.

an adverse action was taken against him; and 3) a causal connection between the protected activity and adverse action.[179] The same elements apply to Section 504 claims.[180] All of the elements exist here. There is no dispute that A.T. and G.T. engaged in advocacy to obtain full and effective education for A.J.T. and to avoid disability discrimination. There is strong evidence of retaliation and the connection to protected activity.[181] Engagement in a protected activity is shown by parental protest to what is believed to be discriminatory action by a school district, including requests for investigations and initiating legal action.[182]

Once shown, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the adverse action; if satisfied the burden returns to the plaintiff to demonstrate pretext.[183] The District has not demonstrated a reason for its mistreatment of A.T. and G.T. and an inference of retaliatory motive is reasonable under the circumstances.

If recipients of public funding "were permitted to retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of [federal non-discrimination protections] might go unremedied as a result."[184] As with Title IX, reporting incidents of discrimination under Section 504 and Title II is integral to enforcement "and would be discouraged if retaliation against those who report went

---

[179] *Mershon,* 442 F.3d at 1074.
[180] *Bradley v. Arkansas Dep't of Educ.,* 443 F.3d 965 (8th Cir. 2006).
[181] Tharpe Affidavit.
[182] *Bradley,* 443 F.3d at 976.
[183] *Id.*
[184] *Jackson,* 544 U.S. at 180.

unpunished" and the "enforcement scheme would unravel."[185] "Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied."[186]

Proof of intent to retaliate can be demonstrated where no direct evidence exists by establishing a prima facie case and the absence of a legitimate non-discriminatory reason for the adverse actions.[187] The litany of adverse actions taken by the District against A.T. and G.T. to squelch their advocacy efforts on A.J.T.'s behalf would have certainly deterred most parents from continuing to advocate. The fact that A.T. and G.T. are extraordinary advocates for their daughter and persisted despite the District's retaliation is a tribute to their strength, love and tenacity, and not a reason to diminish a fair assessment of the harmful effects.

## IV. IDEA VIOLATIONS CAN ESTABLISH DISCRIMINATION

The District argues that violations of Section 504 and the ADA cannot be predicated on violations of the IDEA, but that claim is not supported by any authority. The Eighth Circuit Court of Appeals has long recognized that federal laws prohibiting disability discrimination and those requiring special education "are entirely different statutes" but that violations of the IDEA do not also conclusively establish disability

[185] *Id.*
[186] *Id.* at 180-81.
[187] *Peebles,* 354 F.3d at 770.

discrimination.[188] But the Court has never ruled out the possibility that, under the right circumstances, violations of the IDEA could also establish disability discrimination. These are the right circumstances because the IDEA remedies are incomplete.

Because compliance with the procedural requirements of the IDEA is one way to show compliance with Section 504,[189] the converse must also be true. That is, non-compliance with procedures required by the IDEA, coupled with discriminatory intent and effect, are sufficient to show violations of Section 504. The Third Circuit has held that violations of the IDEA "are almost always violations of the [Rehabilitation Act]."[190] Here, the evidence at hearing clearly established the District's serious non-compliance with IDEA procedures when it repeatedly decided to shorten A.J.T.'s school day entirely *outside of* the IEP Team process and without regard to her individual needs.

## CONCLUSION

Material facts over which no genuine dispute exists support summary judgment in favor of Plaintiffs as to the District's liability and damages and that result would be best. At the least, there are genuine factual disputes that preclude summary judgment, such as the justification for and impact of the unequal length of A.J.T.'s school day, the real reason she was denied a full day of school and the actual decision-maker(s), what District

[188] *Monahan v. State of Neb.*, 687 F.2d 1164, 1170 (8th Cir. 1982).
[189] 34 C.F.R. § 104.33(b)(2).
[190] *Andrew M. v. Delaware Cty. Office of MH and MR*, 490 F.3d 337, 349 (3d Cir. 2007).

officials actually knew about the discrimination and complaints, and the full impact of discrimination and retaliation on Plaintiffs.

Respectfully submitted,

**SCHOOL LAW CENTER, LLC.**

Dated: August 18, 2022

By: *s/ Amy J. Goetz*

Amy J. Goetz (#214711)
520 5th Street South
Stillwater, Minnesota 55082
(651) 222-6288
agoetz@schoollawcenter.com

**ATTORNEYS FOR PLAINTIFFS**