UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| A.J.T., a minor child, by and through her Parents, A.T. and G.T.; and A.T. and G.T., individually and jointly,<br><br>    Plaintiffs,<br><br>v.<br><br>Osseo Area Schools, Independent School District No. 279; and Osseo School Board,<br><br>    Defendants. | Court File No. 21-cv-1760 (MJD/DTS)<br><br><br><br>**AFFIDAVIT OF AARON THARPE** |

STATE OF MINNESOTA    )
COUNTY OF WASHINGTON )

    Aaron Tharpe, under penalty of perjury, states:

    1.    I am one of the Plaintiffs in this matter and the Father of A.J.T., the subject of these proceedings, and make this Affidavit on behalf of her Mother and I in response to the motion for summary judgment.

    2.    Since she was six months old, our daughter has had intractable epilepsy and developmental delay for which we have diligently sought medical care and treatment. Her medical condition substantially limits several major life activities and she has always been eligible for special education. Accordingly, during her educational career, she has always had an Individualized Education Program (IEP).

    3.    Our daughter's medical providers have advised us to avoid *any* morning activities, including school, medical appointments, or recreational activities. They have

1

determined that she needs an uninterrupted sleep schedule into mid-morning, and then a slow preparation for the day in order to minimize seizure activity. We have followed that medical advice.

4.     We have attempted to alter her morning care and treatment regimen many times over the years and doing so definitely increases her seizure activity.

5.     We have been advised by her medical providers to do all we can to avoid increased seizure activity in order to reduce damage to her brain and body, as well as the suffering that accompanies seizures.

6.     Every school our daughter has attended has agreed to excuse her attendance in the morning based on her medical care and treatment needs as documented by one neurologist after another, and in Kentucky the Boone County School District provided a modified schedule as a reasonable accommodation based on her disabilities and needs for a full school day like her peers.

7.     Over the years, the noon start time has been recommended by numerous neurologists providing care to my daughter, including those at Cincinnati Children's Hospital, Mayo Clinic, Gillette Children's Specialty Healthcare and Minnesota Epilepsy Group. Ex. A.[1] Each of these recommendations was provided to the District.

8.     The Kentucky schools provided our daughter instruction outside "regular" school hours, from noon to 6:00 p.m. in order to avoid disability discrimination by providing her a school day that was not equal to her peers, and because she needs

---

[1] References are to Exhibits attached to Goetz Affidavit.

maximum instruction to learn. Full-time services were provided starting in 2011 with in-school instruction from noon to 3:45, and in-home instruction from 4:00 to 6:00, three days per week from a special education teacher and two days a week from a publicly-funded behavior specialist, Mary Grace Ott. Ex. B. Ms. Ott confirmed these hours in her attached affidavit as well as in her testimony at hearing. We discovered that her last Kentucky IEP did not accurately reflect all of her hours of instruction only when we began the second hearing, but we did not discover this mistake during our time in Kentucky because our daughter received the full day of service her IEP Team agreed to provide her, from 12:00 noon to 6:00 p.m.

9.      When deciding to provide our daughter with late afternoon instructional hours, Pam Eklund, Boone County Schools (Kentucky) Special Education Director, told me that the school was providing services outside regular hours to typical students for clubs, sports and other educational activities, so it only made sense that it would provide a full day of services to our daughter as well.

10.     In May 2014, I accepted a new job at Target in Minnesota. For the first fifteen months of my employment, I commuted between an apartment in Minnesota and my home in Kentucky where my wife and daughter lived.

11.     In Spring 2015, we began considering if my wife and daughter would relocate to Minnesota. Whether or not they moved was dependent upon us finding appropriate medical providers and a school that could provide a similar or better education to what our daughter received in Kentucky.

12.     I contacted Osseo School District (District), as well as other Minnesota districts, to discuss our daughter's Kentucky IEP.  In May 2015, I provided the IEP to Paula Rackner (Osseo Special Education Coordinator) and John Norlander (Osseo Special Education Coordinator).  During e-mails between Rackner and me on May 13, 2015, a telephone conversation with Rackner on May 14, 2015, and follow-up e-mails between me and Norlander on May 15, 27, 29, June 8, and 11, 2015, we discussed the fact that our daughter received instruction from noon until 6:00 p.m., and I was told that the Kentucky IEP would be adopted in its entirety.  Relying on the promise, we decided to move from Kentucky to Minnesota, and selected a home in the District.

13.     On July 13, 2015, I sent an e-mail to Rackner and Norlander informing them that my family would be moving to Minnesota, providing our new home address in Minnesota.  In the e-mail, I also provided a letter from my daughter's Developmental Pediatrician, Patricia Manning-Courtney, MD, and offered to provide additional medical information if needed.  Rackner responded with an e-mail hoping that our move went smoothly.

14.     In August 2015, during open enrollment, I again provided the District my daughter's Kentucky IEP, as well as a large packet of medical information (though such was not requested) supporting my daughter's disabilities and school related accommodations, including her need for a full school day from noon to 6:00 p.m..  As part of enrollment, I also signed a release for Boone County Schools to provide the District with all medical records, assessments and special education records (including verification of "handicap" as described in the language of the release).  And, before her

4

first day, and prior to each school year thereafter, my wife signed a release providing the District the unfettered right to contact our daughter's neurologist to discuss her medical condition.  Ex. C.  During enrollment, I also introduced myself to Rackner and we briefly discussed our daughter's transition to the District which would occur in October 2015.

15. On September 21, 2015, I attended an IEP Team meeting with District officials to discuss our daughter's transition to Cedar Island Elementary School in the District where we again discussed her need for and provision in Kentucky of a full day of school on a modified schedule.

16. In early October 2015, our family moved to our home in Minnesota.  Our daughter was scheduled to start school on October 21, 2015.

17. On October 14, 2015, I attended another IEP Team meeting with District officials – seven days before our daughter was to begin school.  During this meeting, Amy Stafford, Special Education Coordinator, for the first time, told me the District would *not* adopt the Kentucky IEP in its entirety, refusing to provide instructional hours from until 6:00 p.m. as provided by the Kentucky IEP.  Stafford stated that the District was not required to provide instruction outside regular school hours, and was prohibited from providing both in-school and at-home instruction.  Ex. D.  Instead, Stafford stated that the District would only provide instruction from noon to 3:15 p.m. (though the regular school day ended at 4:00 p.m.).  The early 3:15 p.m. end time was proposed by the District for "safety reasons" because my wife provided transportation and the buses blocked the egress door to transport students without disabilities.  There was *no* discussion about whether our daughter needed less than a full school day.

5

18. When the District decided to reduce her instructional hours, our daughter had not started school at Cedar Island Elementary School. Nobody from the District had taught or even observed her. The District had not completed an evaluation. I had signed all releases for information requested by the District. The District had not requested additional medical information. And the District had not requested additional educational records.

19. During the October 14, 2015 meeting, I specifically told the District that its decision to give our daughter less than a full day of school equal to her peers was discriminatory and did not comply with the Americans with Disabilities Act. My complaint of disability discrimination was documented in the notes of Dan Wald, Principal, Cedar Island Elementary School, and Amy Stafford, Coordinator. Ex. D.

20. On October 15, 2015, I sent an e-mail to Amy Stafford. Again, I told her that "…the accommodation was proposed [instruction from noon to 6:00 p.m.] because [our daughter] is not able to attend school until after noon due to regular morning seizure activity. It is our position she should be afforded similar hours of instruction as non-disabled students and that the proposed modification to instructional hours is reasonable." In the same e-mail, I told Stafford that the District had not told me its position to reduce hours in conversations and e-mails before I chose to move to the District, during open enrollment, or in our prior IEP meetings. In the same e-mail, I told Stafford the delay in the District informing me of its decision "…materially impacted my ability to participate in the interactive process required under the ADA, IDEA and other state and federal laws."

21. On October 19 or 20, 2015, I had another meeting with District officials at Cedar Island Elementary School. During that meeting, I again complained that the District's refusal to even consider providing instructional hours beyond the end of the regular school day was discriminatory.

22. On October 20, 2015, in response to the decision to reduce hours, I provided the District a document alleging that "…the District had not scheduled sufficient IEP meetings to discuss appropriate accommodations from an education and safety perspective and/or engage in the interactive process to meet the needs of [our daughter]."

23. Although I made specific allegations of discrimination with facts supporting my concerns, the District did not inform me of its non-discrimination policy. And the District did not investigate my complaints.

24. Early in the 2015-2016 school year we convinced District officials to provide our daughter instruction from noon to 4:15 p.m., but we never agreed this was fair, equal or sufficient to meet her needs.

25. For the next six years, in countless IEP Team meetings, Conciliation Conferences, and other school meetings with District officials, we consistently complained that our daughter was being discriminated against, regressing (or not progressing at the same rate as when she was in Kentucky), and that she deserved a full school day similar to typical students and as she received in Kentucky.

26. Not once was there an IEP Team discussion or decision about our daughter's need for a shortened school day and there was no consideration of opinions on

that topic from any of her teachers, any evaluators, any medical providers or us as her Parents. We were simply told by the Coordinator who attended as the District's official representative, time after time, that "the District" decided it would not provide the full school day we requested. The stated reasons included: a) on 10/16/15 - "The district has denied this request saying state law does not mandate this support from the school district"; b) on 3/18/16 - "The District stands ready to provide services and programming in school for a full day or prior to 12:00 pm each day as [A.J.T.]'s medical needs allow"; and c) on 6/6/16 - "The district discussed an extended school day and decided against it due to the precedent it would start. For Osseo School District and other districts across the area [sic]." The District continued to propose experimenting with alterations to our daughter's morning care and treatment routine that we repeatedly rejected as against medical advice and too risky.

27.     On February 18, 2018, Joy Fredrickson, Special Education Coordinator, asked to meet with my wife and me. In that meeting, she told us that when our daughter matriculated to middle school, her instructional hours would be *further* reduced to noon to 3:00 p.m. (from noon to 4:15 p.m.). She told us her hours would be reduced since the regular school day ended at 2:40 p.m. without *any* discussion of whether our daughter needed less than a full school day or reduced hours. We were distraught that the District wanted to further reduce our daughter's instructional hours just because the standard hours of school operation were changing. The proposed reduction had nothing to do with our daughter's needs and did not accommodate her disability.

28. On March 16, 2018, we met again with Fredrickson. During that meeting, we proposed six options so our daughter could at least keep current instructional hours, including: (1) she would progress to the 6th grade and the District would provide educational services until 4:15 p.m.; (2) she would receive instruction at the middle school from noon to 2:40 p.m. and additional instruction would be provided by an aide at the middle school from 2:40 p.m. to 4:15 p.m.; (3) she would receive instruction at the middle school from noon to 2:40 p.m. and an aide would provide additional instruction in our home on agreed upon dates and times; (4) she would receive instruction at the middle school from noon to 2:40 p.m. and then at the elementary school directly across the street until 4:15 p.m.; (5) she would progress to the 6th grade but be instructed at the elementary school until 4:15 p.m.; or (6) she would be kept in the 5th grade and instructed at the elementary school from noon to 4:15 p.m. When making these proposals, we were not abandoning our position that our daughter deserved a full day of school, but trying to find a way to avoid having her instructional hours further reduced.

29. On April 2, 2018, the District sent a Prior Written Notice refusing all our suggested accommodations and offering only to provide instruction from noon to 3:00 p.m. at the middle school.

30. Three days later, on April 5, 2018, the District held its first IEP meeting for the upcoming year. Incredibly, someone at the District made the decision to reduce hours before we had an IEP Team meeting to discuss progress, goals and objectives for the next year, our daughter's needs or whether she needed a shortened school day.

31. On April 23, 2018, I sent an e-mail to Fredrickson summarizing the above and informing her that it was my position that "…the District's actions and positions are unlawful, discriminatory and/or retaliatory for many reasons, including [our daughter's] race, sex, disability and/or protected class, and or parental protected activity [advocating for our daughter during the cooperative IEP Team process], and the District is not in compliance with [*Endrew F. v. Douglas County School District*] and other state and federal laws."

32. Just as in years prior, the District did not inform us of its non-discrimination policy or its complaint procedures. And the District did not investigate or resolve our complaints.

33. This is when the District began treating me differently than in the past. In my April 23, 2018 e-mail, considering the District's proposal to further reduce hours, I asked Fredrickson to provide a "detailed description of the District's proposed 3.00 educational hour day, in fifteen minute or less increments, showing tasks to be performed and IEP goal alignment…" I explained that I wanted to understand the impact of the reduction of 1.25 educational hours so I knew what would be reduced or eliminated, and if the District chose to combine tasks why they were not combined before. I explained that our daughter's teacher, Pam Kohlhepp, had easily provided this breakdown in past years so the District should be willing to do for the upcoming year.

34. In her May 4, 2018 response e-mail, and in future responses, Fredrickson refused to provide a breakdown as had been done in past years, instead only provided general categories so we would not know the specific impact of a reduced school day.

35. On April 30, 2018, I sent an e-mail to Fredrickson, informing her that I had filed disability discrimination complaints with the Minnesota Department of Education, the U.S. Department of Education Office for Civil Rights, and the U.S. Department of Justice Civil Rights Division. and that copies of the complaints had been mailed to Superintendent Kate Maguire.  In a response e-mail, Fredrickson stated the District received the complaints.

36. On February 1, 2019, the District started this litigation, filing for a due process hearing to reduce our daughter's instructional hours.  After we retained counsel, the District's request was withdrawn.

37. In June 2019, the District covertly recorded a conversation between District officials, our daughter's neurologist, and me while we discussed her medical condition without my, or the neurologist's, prior notice or consent.  It is my understanding that recording parents, students and their medical providers while soliciting private health information without prior notice and consent is contrary to the law and District practices. Still, the District offered the a transcript of that recorded private health information as an exhibit during the second due process hearing we initiated to finally obtain a full day of school for our daughter.

38. Dr. Joe Reichle, preeminent expert in the field of speech, language, communication and assistive technology for children with severe communication disorders, was retained by the District as an independent educational evaluator as a term of agreement when the District withdrew its hearing against us in 2019.  Dr. Reichle made numerous sound recommendations to improve our daughter's communication

11

skills, including providing her instruction from noon until 6:00 p.m. and providing her with eye gaze technology with a speech generating device, many of which were not implemented by the District without discussion, justification, or IEP Team agreement. Ex. E.

39.    After the April 21, 2021 administrative decision finding that the District violated our daughter's special education right to a free appropriate public education, the District continued to show animus towards our family and the retaliation intensified. To bolster its legal position, the District sought to create new evidence to show that the additional instructional hours it was ordered to provide made no difference, or suddenly caused an increase in seizure activity during that time, and did so in ways that further harmed our daughter and us. We have personally provided instruction to our daughter between 4:15 and 6:00, as did her educators in Kentucky, and as did Dr. Reichle in his intervention evaluation, and she not only tolerates well but makes meaningful progress during those times. Her seizure status between 12:00 noon and 6:00 p.m. has been stable and there is no reason to believe that her seizures have increased simply because the District was ordered to provide additional services.

40.    First, although ordered on April 21, 2021, the District failed to secure eye gaze technology until October 12, 2021 – almost six months later. And, the device was only provided for instruction at school during the hours of noon to 4:15 p.m., not during the late afternoon sessions at home where the District sought to show lack of progress. Only after repeated requests did the District provide the eye gaze device for the afternoon home sessions in March 2021.

41. Second, the District consistently cancelled instructional sessions. The following instruction was cancelled and not made up by the District: In 2021, November 5, 2:30-4:15; November 12, 2:30-4:15; November 18, 4:30-6:00; November 23, 4:30-6:00; November 24, 4:30-6:00; November 29, 4:30-6:00; December 1, 4:30-6:00; December 3, 4:30-6:00; December 7, 4:30-6:00; December 8, 4:30-6:00; December 10, 4:30-6:00; December 14, 4:30-6:00; December 15, 4:30-6:00. In 2022, January 4, 2:30-4:15; February 2, 4:30-6:00, February 3, 4:30-6:00, April 20, 4:30-6:00; April 29, 2:40-4:15; June 3, 4:30-6:00; June 7, 4:30-6:00 and June 9, 4:30-6:00. While not an exhaustive list of cancellations, this reflects a significant amount of missed instruction, mostly in the afternoon sessions during times the District sought to show that our daughter cannot make progress. Our daughter has also missed additional instruction when staff were late, causing her to miss ten to fifteen minutes and sometimes up to thirty minutes of instruction that was not made up. In 2021, this occurred on September 20, September 29, October 18, November 1, November 11, November 22, November 30, December 2, and December 16. Staff were only late during afternoon instructional sessions during times the District sought to show that our daughter cannot make progress.

42. Third, the District removed one of our daughter's afternoon teachers, assigning her to another student. On November 18, 2021, Jan Bitzer, Special Education Coordinator, sent an e-mail stating that our daughter's afternoon teacher, Linda Tangren, who was providing services from 4:15 p.m. to 6:00 p.m. in the home on Tuesdays, Wednesdays and Fridays "will no longer be providing services."

43. I responded to the e-mail that I knew the District chose to reassign Linda Tangren, and that it was the reason the teacher is no longer available. In the e-mail, I told the District that I felt the reassignment was continued animus and retaliation against our family.

44. On December 14, 2021, Bitzer sent me an e-mail apologizing for the teacher's removal and informing me that the previous teacher, Linda Tangren, would be reassigned again to our daughter. I was told the teacher would be reinstated January 4, 2022.

45. Fourth, the District demonstrated animus when it failed to comply with the agreement of the IEP Team to schedule an IEP Team meeting once baseline data was secured so that new goals and objectives could be agreed upon and progress measured. The District did not comply with the Team agreement so it could hastily try to supplement the record in its appeal of the adverse administrative hearing. On May 7, 2021, at our first IEP meeting after the April 21, 2021 Order, due the lost 2020-2021 academic year when in-person instruction was not available, the Team agreed that goals and objectives would not be altered until baseline data was secured so that goals and objectives could be discussed and agreed upon and progress properly measured.

46. On November 4, 2021, Bitzer stated that she would like to schedule an IEP Team meeting. On November 29, 2021, I attended an in-person IEP Team meeting. This was the first meeting where District officials discussed with me proposed baseline data. On December 13, 2021, I attended a follow-up in-person IEP Team meeting. On January 2, 2022, the District filed a motion to supplement the record with "progress data" in the

14

special education appeal. On January 3, 2022, the District provided me with its proposed IEP based on its understanding of baseline data. Fueled by its animus towards my family, for months, the District failed to inform me it had alleged baseline data so that we could discuss an IEP. Instead, it secretly tracked "progress" in an attempt to hastily show that our daughter can't progress with additional instructional hours.

47. Fifth, District educators began to act differently around my wife and me. Beginning in January 2022, we noticed educators no longer told us how our daughter's day was with any specificity. They were noticeably quiet and no longer engaged in friendly banter. And they stopped calling us if they were running late, had to cancel, or needed to communicate for any other reason. All communications between our family and educators began to flow only through Jan Bitzer. In particular, educators seemed uncomfortable around me. I felt like my role as our daughter's advocate and District animus were hurting her education. So, I no longer worked in my home during instructional hours, travelling instead downtown to work, in an attempt to make educators more comfortable and hopefully reduce the impact it had on our daughter's education.

48. Sixth, the District consistently refused to obtain medical information from our daughter's providers despite having constant authorization, instead attempting to create its own seizure tracking and medical information and complaining about lack of data. When the District filed for a due process hearing on February 1, 2019, one of its stated reasons was to obtain more medical information. Inexplicably, the District did not seek any medical records in the special education hearing although we agreed to provide it or again authorize its release. And, the District did not seek any medical records in this

15

case, though we signed releases for Cincinnati Children's Hospital, Mayo Clinic, Gillette Children's Specialty Healthcare and Minnesota Epilepsy Group and the District subpoenaed those records. In my February, 2022 deposition, I told the District that our daughter participated in an FDA approved drug study for Fintepla (Fenfluramine) for several years, beginning in or around 2018, where seizure data was tracked. I also told our daughter's elementary school teacher, Pam Kohllepp, when the study began, so she would inform us of seizure activity at school. And, each year we signed a release giving the District the unfettered right to contact our daughter's neurologist to discuss her medical condition. Still, the District refuses to obtain our daughter's medical records or to disclose those records if obtained.

49. Seventh, the District is currently retaliating against us by refusing to hold a second IEP Team meeting. During our many years in the District, we have had multiple IEP Team meetings to discuss goals and objectives because our daughter's needs are so complex and extensive. These are regularly offered to any parent wanting to discuss their child's IEP. On July 11, 2022, although I informed her of our long history of having multiple IEP meetings when needed, Kate Emmons refused in her e-mail response to permit the convening of a second meeting. Instead, she only offered a conciliation conference, mediation, facilitated IEP meeting, or a due process hearing.

50. In her deposition, Kate Emmons testified that she knew nothing about this dispute and had not spoken to anyone about it. But we personally met more than once with Ms. Emmons as the Special Education Director and 504 Coordinator to complain about the District's discriminatory treatment of our daughter. She told us that we should

16

hire a personal care attendant after school hours instead of extending her school day, reflecting stereotyped misperceptions that our daughter was not worthy of a full day of instruction. Ms. Emmons also testified that she supervises the Coordinators who, over the years, dictated the shortened school day for our daughter and heard but ignored our discrimination complaints. We believe that the District, through its Coordinators, acted at the direction of Ms. Emmons.

51. The District's retaliatory actions towards me and our family have worn us down, dampened our advocacy efforts, required extraordinary efforts to resist, impaired our time with family and work, harmed our relationships with teachers, and affected our daughter's education by reducing our collaboration and her instructional time.

52. The District's disability discrimination has harmed our family by creating intense conflict to resolve a simple problem, by impairing the cooperative IEP Team relationship that should serve our daughter, by reducing her instructional time and the critical progress she needs to move towards independence and success in life, and has drained our personal and financial resources put aside for her future to date in the amount of $ 364,425.70 for costs and fees of experts and litigation.

53. The District's discrimination and retaliation have caused additional damages to our daughter as appropriately identified and quantified by Dr. Reichle in his expert damages reports. Ex. F.

54. Unless permanently ordered to provide our daughter a full school day, the communication assistive technology she needs, and to pay the costs to obtain these

modest results, the District will persist in its efforts to treat our daughter and our family unfairly, and our family will continue to suffer harm from the damages inflicted on us by the District.

Date:  August 18, 2022                    By: *s/ Aaron Tharpe*