# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

A.J.T., by and through her
parents, A.T. and G.T.,
individually and jointly,

                 Plaintiffs,

v.

                                **MEMORANDUM OF LAW AND ORDER**
                                Civil File No. 21-1760 (MJD/DTS)
                                **Filed Under Seal**

OSSEO AREA SCHOOLS,
INDEPENDENT SCHOOL
DISTRICT NO. 279, and OSSEO
SCHOOL BOARD,

                 Defendants.

Amy J. Goetz, School Law Center, LLC, Counsel for Plaintiffs.

Christian R. Shafer, Elizabeth M. Meske, Laura Tubbs Booth, and Timothy A.
Sullivan, Ratwik, Roszak & Maloney, PA, Counsel for Defendants.

## I.      INTRODUCTION

Plaintiff AJT is a teenage girl with a severe form of epilepsy called Lennox-

Gastaut Syndrome ("LGS"). As a result of her disability, AJT has significantly

diminished intellectual capacities and has seizures throughout the day. Since

moving to Defendant Osseo School District ("the District") in 2015 from

1

Kentucky when she was in fourth grade, AJT and the District have agreed that she is unable to begin school until noon due to morning seizure activity.

In 2021, an administrative law judge ("ALJ") held a hearing ("the administrative hearing"), found the District had violated the Individuals with Disabilities Education Act ("IDEA"), and ordered the District to provide AJT with eye gaze technology and compensatory hours of education, among other things.  (Def. Ex. 25 (ALJ Decision) at 20.)  On September 13, 2022, the Court affirmed the ALJ's Decision.  Osseo Area Schs. v. A.J.T., Civil File No. 21-1453 (MJD/DTS), 2022 WL 4226097, at *21 (Sept. 13, 2022) [hereinafter, "Osseo Area Schools"].

In the instant case, Plaintiffs assert three claims against the District: (1) violations of the IDEA; (2) violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504"); and (3) violations of the Americans with Disabilities Act ("the ADA").  (Amend. Compl. ¶¶ 113-47.)

Currently before the Court is the District's Motion for Summary Judgement.  (Doc. 31.)  The Court heard oral argument via Zoom on October 12, 2022.

2

As discussed in detail below, the evidence in the record supports granting Defendants' Motion for Summary Judgment.  Even assuming AJT was denied the benefits of a program or activity of a public entity receiving federal funds and/or discriminated against based on her disability, the District did not act with bad faith or gross misjudgment when making educational decisions regarding AJT.  In addition, even if the District took all the actions Plaintiffs allege it took, there is no evidence it did so to retaliate against AJT's parents for their advocacy on behalf of AJT.  Finally, Plaintiffs' IDEA claims are foreclosed for a number of reasons.  Thus, the District's Motion for Summary Judgment is granted.

## II.    BACKGROUND

The facts of the case are well-known to the Court and the Parties and detailed in the Court's Order in Osseo Area Schools.  The Court only includes facts here that are relevant to discussion of the instant motion.  The relevant facts relate to AJT's elementary and middle school schedules.  The Parties have briefed another motion related to AJT's high school schedule.  See Osseo Area Schs. v. A.J.T., No. CV 21-1453 (MJD/DTS), 2022 WL 17082826, at *1 (D. Minn. Nov. 18, 2022) (Order Denying Def's Motion for an Order to Show Cause Why Pl. Should Not be Found in Contempt) [hereinafter, Osseo Area Schs. II].

**A.      Scheduled School Day in Kentucky Versus in Minnesota**

According to the Amended Complaint, while a student in Kentucky, AJT

received instruction from the public school from noon until 6:00 p.m. each day,

mostly in-school but supplemented with hours of instruction in her home, which

resulted in the same number of instructional hours as her nondisabled peers.

(Amend. Compl. ¶¶ 42-43.)  AJT's school days always began at noon.

For the most part, a typical school day for a student in the District is 6.50

hours.  That has been the goal for AJT's parents, AT and GT, since they moved to

the District.  However, due to AJT's unavailability for instruction before noon,

the District never provided AJT 6.50 hours of in-school instruction.

After several negotiations including different proposed IEPs, AJT has been

in school 4 hours and 15 minutes each day for most of her years in the District

receiving intensive special education services.  She always has one or two adults

working solely with her providing services and working on her learning goals.

(Def. Ex. 25 (ALJ Decision) at 9.)

**B.      Negotiations Between AJT's Parents and the District**

Plaintiffs assert that before the family moved from Kentucky to Minnesota,

they received assurances from the District that it would adopt AJT's Kentucky

IEP "in its entirety."  (AT Aff. ¶ 12.)

When AJT entered the District in October 2015, the IEP team, including AJT's parents, agreed that starting the school day at noon was appropriate given AJT's individual needs.  (Def. Ex. 16 (Oct. 16, 2015 Prior Written Notice ("PWN")) at 2 (stating that AJT "can not [sic] come to school in the morning due to her seizure activity through the night and in the morning").)

When AJT's IEP team first met in 2015, the District proposed an IEP that "generally accepted the goals and objectives on AJT's most recent IEP from Kentucky."  Osseo Area Schs., 2022 WL 4226097, at *4.  AJT's parents requested two more IEP meetings, which were held on October 14 and 20, 2015.  At the October 14 meeting, AT asked if the school would provide support in the evening and was told that the school did "not provide both homebound and school support (modified)."  (Pl. Ex. D at 2.)  The District's notes from the October 14, 2015 IEP team meeting state that AT said that he felt the District's failure to provide educational support in the evening "might conflict with the ADA.  He wants statute.  His position [was] that [AJT] can handle a full day, it just can't start until noon."  (Id.)

Following those meetings, the District proposed an IEP that accepted the goals and objectives from AJT's Kentucky IEP and included minutes of special

education service commensurate with those in the Kentucky IEP.  <u>Osseo Area Schs.</u>, 2022 WL 4226097, at *4.  The Kentucky IEP called for 125 minutes of special education in school daily and 90 minutes of in-home special education daily, for a total of 215 minutes of special education instruction per day.  (Def. Ex. 9 at 8.)  The District's IEP included 240 minutes of direct special education daily and 20 minutes of direct speech services weekly.  (Def. Ex. 11.)

During AJT's years in the District, the Parties had several IEP meetings and the District issued more PWNs.  At one point, AJT's parents complained "the District has not scheduled sufficient IEP team meetings to discuss appropriate accommodations . . . and/or engage[d] in the interactive process" to meet AJT's needs.  (Def. Ex. 10 at 1.)  After negotiation, the Parties agreed that AJT's school day would be from noon to 4:15 p.m., which was extended after the usual elementary school day ended at 4:00 p.m.  The IEP containing this schedule was the last-agreed upon IEP between the Parties—the "stay-put" IEP that remained in place during the pendency of disputes between the Parties.  <u>Osseo Area Schs.</u>, 2022 WL 4226097, at *5.  Thus, AJT's school days have been 4.25 hours rather than the 6.50 hours her parents requested.

Beginning in February 2018, in preparation for AJT's transition from elementary school to middle school, AJT's parents met with Former District Special Education Site Coordinator Joy Fredrickson to discuss AJT's middle school day.  (AT Aff. ¶ 27.)  A typical middle school day ends at 2:40 p.m. and AJT's parents were "distraught" to learn that AJT would have shorter school days in middle school.  (Id.)  On March 16, AJT's parents again met with Fredrickson and provided six options for 4.25-hour middle school days for AJT. (Id. ¶ 28.)  On April 3, the District sent AT and GT a PWN proposing a noon to 3:00 p.m. school day.  (Id. ¶ 29.)  At an April 5, 2018 IEP meeting, AJT's parents found it "incredible" that the District "made the decision to reduce hours before [they] had an IEP Team meeting to discuss program goals and objectives for the next year, [AJT's] needs or whether she needed a shortened day."  (Id. ¶ 30.)  In the end, AJT's middle school day schedule continued to be from 12:00 to 4:15 p.m. under the stay-put IEP.  Osseo Area Schs., 2022 WL 4226097, at *5.

On April 23, 2018, AT sent an email to the District stating that he felt the District's acts were discriminatory and retaliatory based, in part, on AJT's "disability . . . and or parental protected activity" of advocating for AJT during the IEP process.  (AT Aff. ¶ 31.)  AT attested that "just as in years prior," the

District did not investigate or resolve his complaints and did not provide him with its nondiscrimination policy or complaint procedures. (Id. ¶ 32.) He avers that this is when the District began treating him differently. (Id. ¶ 33.) On April 30, 2018, AT sent an email to Fredrickson stating, inter alia, that he had filed complaints with the Minnesota Department of Education ("MDE"), the U.S. Department of Education Office for Civil Rights, and the U.S. Department of Justice Civil Rights Division. (Id. ¶ 35; Def. Ex. 23.) This dispute was apparently resolved by "the Parties agreeing to an Independent Education Evaluation (IEE) of [AJT by Dr. Reichle], and a later triennial evaluation, and using these materials to guide later educational planning." (Def. Ex. 25 (ALJ Decision) at 3-4.)

Throughout the process, the District has refused to provide evening instruction because, variously, the District does not provide "both homebound and school support" (Pl. Ex. D (Dist. Oct. 14, 2015 IEP meeting notes) at 2); state law does not mandate it (Def. Ex. 16 (Oct. 16, 2015 PWN) at 2); and/or the District was worried about the precedent it would start not only in the District, but for area school districts (Def. Ex. 18 (June 6, 2016 PWN) at 1).

Each year, AJT's parents provide the District with a letter from AJT's treating neurologist requesting that she be "exempted from school attendance

8

before noon in order to manage her seizure activity." Osseo Area Schs., 2022 WL

4226097, at *5 (cleaned up).  The District offers to serve AJT whenever she is

available during the regular school day, including before 12:00 p.m.  (See, e.g.,

Def. Ex. 22 (April 2, 2018 PWN) at 2.)

### C.    Dr. Joe Reichle's IEE and Trial Tests

In 2019, at the Parties' request, Dr. Joe Reichle conducted an independent

educational evaluation ("IEE") of AJT.  Osseo Area Schs., 2022 WL 4226097, at *7.

Among Dr. Reichle's recommendations was as much instruction time as possible

"during [AJT's] alert hours," which optimally are "between approximately noon

and 6:00 p.m." Id. (brackets in original).

In autumn 2020, AJT's parents hired Dr. Reichle to conduct a series of

discrete trial tests "to assess how interventions in the mid and late afternoons

might impact [AJT's] learning." Id. (brackets in original).  Dr. Reichel performed

trials of late afternoon instruction from 4:15 to 5:30 p.m. in AJT's home, which he

compared to instruction conducted in AJT's home from noon to 1:15 p.m.  Id.

During the trials, AJT made gains on skills she was learning in school.  Id.

D.    **Statements Made by Special Education Director Katheryn ("Kate")**
      **M. Emmons**

AJT's parents have participated in many meetings with her IEP team and

District officials, including the District's highest special education administrator,

Special Education Director Kate Emmons, to ask that AJT receive a full day of

school beginning at noon.  (Amend. Compl. ¶ 59; AT Aff. ¶¶ 17-32.)

In her role, Emmons develops and promotes suitable procedures for

"identification, evaluation, and instructional programming of children eligible

for Special Education . . . services" and evaluates "the school system's

approaches and students' responses to specialized programs for children not

achieving in special . . . education programs," among other duties.  (Pl. Ex. G at 3

(Emmons' Position Description).)[1]   She is also "responsible for program

development, coordination, and evaluation; in-service training; and general

special education supervision and administration."  (Id. at 15 (District Total

Special Education System).)  Emmons is not only responsible for the District's

special education programs but also oversees implementation and enforcement

of Section 504, which prohibits a federally-funded program from discriminating

---

[1] Plaintiffs' Exhibit G contains many documents and is divided into several parts
(G1, G2, G3, etc.) in the Court's CMECF filing system.

against a disabled individual solely by reason of that person's disability.  (Def.

Ex. 1 (Emmons Dep.) at 41-42)[2]; 29 U.S.C. § 794(a).)  She supervises Coordinators

who, among other things, ensure compliance with policies, procedures, and

rules.  (Def. Ex. 1 (Emmons Dep.) at 15-26.)

 Emmons testified that District policy requires investigation of all

complaints of disability discrimination but that she was unaware of any

investigation regarding AJT.  (Id. at 70-71.)  The District's Nondiscrimination

Policy 102 requires discrimination complaints be reported to the § 504

Coordinator, whom Emmons testified was Jill Lesné.  (Id. at 48-49; Pl. Ex. G2

(Osseo Area Schools Employee Handbook) at 50.)

 Although the Employee Handbook listed Emmons as the § 504

Coordinator in 2020-21, she testified she was not and did not know why the

Handbook stated she was.  (Def. Ex. 1 (Emmons Dep.) at 49.)  Emmons testified

that she would report any discrimination she became aware of to Ms. Lesné.  (Id.

at 48-49.)  Emmons noted that it is every employee's responsibility to comply

---

[2] Plaintiffs cited pages of Plaintiffs' Exhibit G that did not contain this
information. (See Doc. 38 at 11 n.20.)  It was obvious to the Court that this and
other information cited to Plaintiffs' Exhibit G came from Emmons' deposition,
which is Defendants' Exhibit 1.  The Court has corrected the citations.

with the District's nondiscrimination policies and everyone's responsibility to report noncompliance with § 504 once they are aware of it.  (Id. at 44-45, 56.)  On the other hand, she testified that IDEA disputes would be handled via other avenues such as conciliation conferences and mediation.  (Id. at 48.)

At Emmons' deposition, Plaintiffs' Counsel noted that the District's Total Special Education System ("TSES") says that "students can have a combination of alternate methods of instruction, including homebound and in-person instruction."  (Id. at 176-77.)  Emmons responded, "No, where is that?  We might have to modify that."  (Id. at 177; see also Pl. Ex. G at 23 (TSES) ("Program alternatives are comprised of the type of services provided, the setting in which services occur. . . .  A pupil may receive special education services in more than one alternative based on the IEP.") (emphasis added).)

When asked about a discrimination investigation involving AJT in her deposition, Emmons stated she knew nothing about it.  However, AT attests that he and GT met with her more than once to complain about discriminatory treatment toward AJT.  (AT Aff. ¶ 50.)  He states that Emmons' response was to tell them to hire a personal care attendant ("PCA") after school hours instead of extending AJT's school day, which "reflect[ed] stereotyped misperceptions that

12

[AJT] was not worthy of a full day of instruction."  (Id.)  Plaintiffs assert that

other school employees also disclaimed knowledge of AJT's parents' complaints

regarding the number of hours of instruction she received every day.  (Doc. 38 at

11 (citing AT Aff; Emmons Dep.; Ex. G to Goetz Aff., all without pinpoint

citations).)  The only support for this statement in AT's Affidavit is AT's

assertion that he and GT met with Emmons.  (AT Aff. ¶ 50.)

### E.    Expert Reports

AJT filed one expert report and updates thereto and the District filed three

expert reports.  In relevant part, the reports provide the following opinions.

### 1.    Dr. Joe Reichle's Expert Reports

Dr. Joe Reichle, opined, in brief, "the lack of a full school day has

significantly contributed to limit [AJT's] learning opportunities" and that there

was a lack of a comprehensive augmentative communication plan resulting from

a comprehensive assessment of AJT's needs both prior to his 2019 assessment

and after the ALJ's 2021 Decision.  (Pl. Ex. F at 3-4.)  He explained that when he

designed his December 2019 communication trial, he considered morning, early

afternoon, and late afternoon sessions to compare "performance as a function of

time of day," but  AJT's parents were unwilling to take this "substantial health

risk" based on their physicians' opinions "regarding the potential danger of

disrupting AJT's sleep pattern." (Pl. Ex. F2 at 12.) He noted that "Dr.

Breningstall and his predecessors are physicians directed by medical knowledge

and experience. Their recommendations and support of the parents' position . . .

led to [him conducting] only early p.m. and late p.m. . . . sessions." (Id. at 13.)

### 2. The District's Experts

#### a) Dr. Wills' Expert Report

Dr. Karen Wills is a neuropsychologist and is licensed to practice clinical

psychology in Minnesota. (Def. Ex. 2 at 1.) Dr. Wills stated that parents perceive

their children "through rose colored glasses" and overestimate their

competencies. (Id. at 3.) In relevant part, Dr. Wills opined that AJT's rate of

progress was not demonstrably better in Kentucky than in the District, that AJT

has not regressed since enrolling in the District, and that most of AJT's fellow

students' instructional days include non-instructional time. (Id. at 3-7, 11, 15).

#### b) Marcy Doud's Expert Report

The District did not provide Marcy Doud's credentials. (Def. Ex. 28.)

Doud opined that "given [AJT's] disabilities and abilities and her medical

needs," the District chose a reasonable course of education and 1:1 instruction

with limited distractions was the "single common denominator" for AJT's

14

optimal learning environment, regardless of the time.  (Id. ¶ 6.)  She also stated

that AT was at the IEP meeting where the IEP with the 12:00 to 4:15 school day

was proposed, that AJT's parents received the PWN stating that the IEP would

be implemented unless they objected, and that they did not do so.  (Id. ¶¶ 12-13.)

### c) Howard C. Shane, Ph.D.'s Expert Report

Dr. Shane is an associate professor of otolaryngology at Harvard Medical

School.  (Def. Ex. 29 at 1.)  Dr. Shane stated that the central question in this case is

how AJT's school day is divided between home and school.  (Id.)  He opined that

without a systematic review of AJT's seizure pattern across several different

weekdays and weekend days over time, it is impossible to make definitive

conclusions about the best times for AJT to learn.  (Id. at 2.)  He notes that a table

by school staff tracking AJT's seizures during school hours for a month in 2021

showed AJT had multiple seizures in the afternoons at school, some so severe

that she could not return to instruction.  (Id. at 2-3.)  Since AJT has regular

afternoon seizures at school, Dr. Shane states that "it does not seem practical" to

base AJT's schedule "on parental reporting (or preference) of seizure frequency

and severity during the morning and certainly not without a careful analysis of

the occurrence and severity of seizure activity in the [morning]."  (Id. at 4, 16.)

Other facts will be discussed as necessary.

### F.        Desired Relief

The District has filed a motion for summary judgment.  Although Plaintiffs

have not filed a similar motion, they nonetheless assert they are entitled to

summary judgement.  In the alternative, Plaintiffs argue that issues of material

fact exist that make summary judgment for the District inappropriate.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citation omitted).

**B.      ADA and Rehabilitation Act Claims**

**1.      Legal Standards**

Title II of the ADA prohibits public entities from discriminating based on disability in services, programs, or activities.  Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  These statutes provide[ ] the same rights, procedures, and remedies against discrimination.

I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs., 863 F.3d 966, 972 (8th Cir. 2017) (alterations in original) (internal citations omitted).  Claims under the ADA and Section 504 are analyzed using the same standard.  See AP v. Anoka-Hennepin ISD No. 11, 538 F. Supp. 2d 1125, 1139 (D. Minn. 2008).

A plaintiff's prima facie case . . . requires a showing that the plaintiff (1) was a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was discriminated against based on [her] disability.  More specifically, we have said that a claim under § 504 in the context of education of handicapped children requires parents to show that the school district acted in bad faith or with gross misjudgment by departing substantially from accepted professional judgment, practice or standards as to demonstrate that those responsible actually did not base the decision on such a judgment.

Est. of Barnwell v. Watson, 880 F.3d 998, 1004 (8th Cir. 2018) (citations omitted).

In this case, there is no dispute that AJT is a qualified individual with a disability.  In addition, elements 2 and 3 are inextricably intertwined because

17

Plaintiffs assert AJT was denied the same length school day as her nondisabled peers based on her disability.   However, even assuming AJT was denied the benefits of a program or activity of a public entity receiving federal funds and discriminated against based on her disability, Plaintiffs' arguments fail because the District did not act with bad faith or gross misjudgment.

## 2.   Bad Faith or Gross Misjudgment

"[W]here alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that school officials acted in bad faith or with gross misjudgment." B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist., 732 F.3d 882, 887 (8th Cir. 2013) (quotation omitted).  Something more than a "mere violation of the IDEA must be shown to demonstrate a violation of § 504." Brantley ex rel. Brantley v. ISD No. 625, 936 F. Supp. 649, 657 (D. Minn. 1996).

### a)   Plaintiffs' Arguments

Plaintiffs argue that intent should not be required in failure to accommodate claims for disability discrimination in elementary or secondary education because (1) intent is not a burden imposed by § 504 or the ADA or their interpretive regulations and is not required in all circuits; (2) requiring intent is contrary to Supreme Court precedent stating that intent is not a required element of disability discrimination claims (citing

18

Alexander v. Choate, 469 U.S. 287, 295, 309 (1985) (a case dealing with reduction in

Medicaid benefits); (3) Eighth Circuit precedent does not require intent in employment

or post-secondary education reasonable accommodation claims and there is no reason to

treat elementary and secondary education claims differently; and (4) proof of intent is

not required in other jurisdictions (citing Ability Ctr. v. City of Sandusky, 385 F.3d 901,

912 (6th Cir. 2004); Henrietta D. v. Bloomberg, 331 F.3d 261, 277-78 (2d Cir. 2003);

Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999); Washington

v. Ind. High Sch. Athletic Ass'n Inc., 181 F.3d 840, 846 (7th Cir. 1999)).  (Doc. 38 at 31-33.)

While Plaintiffs admit that the Eighth Circuit requires proof of intent in disability

discrimination in education cases based on failure to accommodate and disparate

treatment claims, they argue that in failure to accommodate claims, the standard is

"softened," requiring "only notice of the need for a reasonable accommodation and

school district inaction, delay, or ineffective action."  (Id. (citing M.P. v. ISD No. 721, 326

F.3d 975, 982-83 (8th Cir. 2003)).

In M.P., the court held that a jury could find that a school district acted in bad faith

or with gross misjudgment when it failed to answer a mother's daily phone calls about

bullying her son suffered due to a district employee making his schizophrenia diagnosis

public and never taking steps to protect the boy's safety and academic interests after

19

knowing about the bullying.  326 F.3d at 982-83.  Plaintiffs assert that <u>M.P.</u> is similar to

this case because Plaintiffs also raised issues of "failure to provide reasonable

accommodations at school, failure to investigate complaints of disability discrimination,

and failure to take appropriate and effective remedial measures upon notice to school

authorities."  (Doc. 38 at 37.)   Plaintiffs note that in <u>M.P.,</u> the court held that "[u]nder

some circumstances, notice of a student's disability coupled with delay in implementing

accommodations can show bad faith or gross misjudgment."  (<u>Id.</u> at 38.)

Plaintiffs argue that under either a disparate treatment theory or failure to

accommodate approach, the District discriminated against them with bad faith, a gross

departure from professional standards, and deliberate indifference.  (<u>Id.</u> at 37 (citing,

<u>inter alia</u>, <u>M.P.</u>, 326 F.3d at 982; <u>Monahan v. State of Neb.</u>, 687 F.2d 1164, 1171 (8th Cir.

1982).)  Plaintiffs assert that "ignoring six years of disability discrimination complaints by

A.T. and G.T. was not within the scope of professionally acceptable choices because the

District's own policies expressly prohibit that response." (<u>Id.</u> at 34-35.)   Plaintiffs state

that the District fails to meet its initial burden to establish a lack of discriminatory intent.

Plaintiffs also argue that the familiar <u>McDonnell Douglas</u> burden-shifting analysis

used in employment discrimination cases is appropriate in this case and that they have

evidence sufficient to survive summary judgment under this analysis.  (<u>Id.</u> at 39.)

**b)** **Analysis**

Before reaching the merits of Plaintiffs' arguments, two threshold issues

must be decided: (1) whether the employment cases cited by Plaintiffs are

inapposite and (2) whether the "deliberate indifference" standard championed

by Plaintiffs is proper for a challenge to a student's educational programming.

### i.    Plaintiffs' Employment Cases are Inapposite

Plaintiffs cite several employment cases that only require plaintiffs to

prove defendants failed to provide a "reasonable accommodation" to survive

summary judgment.  (Id. at 27, 32.)  It is  inappropriate to rely on these cases.  See

Frequently Asked Questions About Section 504 and the Education of Children

with Disabilities, 111 LRP 76408 (OCR 2011) at 11 (courtesy copy provided as

attachment to Defendant's Reply).  The Department of Education ("the DOE")

cautions that the term "reasonable accommodation" is "a term used in the

employment context" that is "sometimes used incorrectly to refer to related aids

and services in the elementary and secondary school context. . . ."  Id.  Opinions

from agencies are entitled to at least some deference.  Doe v. Osseo Area Sch.

Dist., 296 F. Supp. 3d 1090, 1098 (D. Minn. 2017) (citing Thomas Jefferson Univ. v.

Shalala, 512 U.S. 504, 512 (1994)) (holding that an agency's interpretation of its

own regulations is entitled to "substantial deference"); see also 34 C.F.R. § 104.33

(schools are required to provide a free appropriate public education ("FAPE") to

disabled students, not "reasonable accommodations").  Deference to the DOE is

especially reasonable here where the McDonnell Douglas analysis from

employment law could have been adopted into the education discrimination

context and the courts declined to do so.

      **ii.**    **The Correct Liability Standard is "Bad Faith or Gross Misjudgment"**

     Plaintiffs assert they need only prove that Plaintiffs acted with "deliberate

indifference" to establish their prima facie case.  However, the Eighth Circuit

> . . . held in AP v. Anoka–Hennepin Indep. School Dist. No. 11 that bad faith
> or gross misjudgment is an element of a disability-discrimination claim
> only in the context of substantive challenges to a disabled child's
> individualized education plan.   In cases not involving challenges to
> educational services, a showing of deliberate indifference on the
> defendant's part is necessary—and sufficient—to recover the
> compensatory damages under the ADA or § 504. . . .

Hough v. Shakopee Pub. Schs., 608 F. Supp. 2d 1087, 1115-16 (D. Minn. 2009)

(holding that searches were not part of a student's educational program and

therefore "deliberate indifference" was the correct standard) (citations omitted);

I.Z.M., 863 F.3d at 973 ("We have consistently held that where alleged ADA

and § 504 violations are based on educational services . . ., the plaintiff must

prove that school officials acted in bad faith or with gross misjudgment.")
(emphasis added) (citation omitted); see also A.K.B. v. ISD 194, No. 19-CV-2421
(SRN/KMM), 2020 WL 1470971, at *13 (D. Minn. Mar. 26, 2020) (applying
deliberate indifference standard in claim for medical accommodation in school).

This case is based on Plaintiffs' dissatisfaction with AJT's educational
services.  Even the retaliation claim, discussed below, is inextricably intertwined
with the provision of educational services.  M.P., cited by Plaintiffs is
distinguishable because that case involved a school district's deliberate
indifference to a mother's pleas for help for her bullied son.  326 F.3d at 982-83.
The Eighth Circuit found the "alleged failure to protect M.P. from unlawful
discrimination on the basis of his disability is a claim . . . wholly unrelated to the
IEP process."  M.P. v. ISD No. 721, 439 F.3d 865, 868 (8th Cir. 2006) [M.P. II]
("Although the Eighth Circuit applied the bad faith or gross misjudgment
standard in M.P., the court only did so because the parties assumed that to be the
standard and the court never discussed the deliberate indifference standard that has
been applied to claims of student-on-student harassment since M.P. was decided.").

### iii.    The District did not Act with Bad Faith or Gross Misjudgment

In order to establish bad faith or gross misjudgment, a plaintiff must show
that the defendant's conduct departed substantially from accepted

professional judgment, practice or standards so as to demonstrate that the
persons responsible actually did not base the decision on such a judgment.
Because the ADA and § 504 do not create general tort liability for
educational malpractice, bad faith or gross misjudgment requires
"something more" than mere non-compliance with the applicable federal
statutes.   The defendant's statutory non-compliance must deviate so
substantially from accepted professional judgment, practice, or standards
as to demonstrate that the defendant acted with wrongful intent.

B.M., 732 F.3d at 887 (cleaned up) (citations omitted).

Plaintiffs argue that when the District ignored six years of disability

discrimination complaints by AJT's parents, it violated the District's own policies

and its actions were not within the scope of any professionally-acceptable choices

available to the District.  As evidence, Plaintiffs state, without citation, that "all"

District officials testified regarding their professional obligations to know and

comply with the law and to ensure that all discrimination claims are investigated

and resolved "pursuant to their licenses, position descriptions, and District

policies."  (Doc. 38 at 4.)  They also aver that while the District's Superintendent,

Emmons, and § 504 Coordinator all expressed ignorance of the Plaintiffs'

discrimination complaints; lack of District response; and even any knowledge of

the dispute, the following evidence undermines those claims:

1)   The professional licensing obligations of each official to know and comply
     with the IDEA, §  504, and the ADA;

24

2)      The position descriptions of each official that requires them to know and comply with the IDEA, § 504 and the ADA and to supervise and ensure compliance by other staff, including Coordinators;

3)      District policies requiring investigation, parental notice of rights, and correction of <u>any</u> discrimination complaint, formal or informal, written or verbal, by <u>every</u> District employee; and

4)      The documentation of disability complaints and credible testimony of AT that he met with and communicated directly with various Coordinators, the Superintendent, and Emmons about complaints.

(<u>Id.</u> at 6-7 (emphasis in original).)  Plaintiffs further assert, without support, "The testimony at [the administrative] hearing established that the District's [Special Education Site] Coordinator, Joy Fredrickson, acted for years at the direction of a source <u>outside of the IEP Team</u> as corroborated by all IEP Team members including AJT's teachers and Parents."  (<u>Id.</u> at 5 (emphasis in original).)

Regarding licensing, position descriptions, and district policies, other than information related to Emmons, Plaintiffs only state,

Each District official <u>did</u> testify to established professional standards, including licensing obligations and position descriptions that require knowledge of the laws that prohibit disability discrimination, and of their professional obligations to ensure compliance with District policies that <u>require</u> reporting, investigation, notice to parents of rights, and correction of disability discrimination complaints, written or verbal, formal or informal.

(Doc. 38 at 11-12 n.21 (emphasis in original) ("Deposition of Kate Emmons, Ex. G to Goetz Affidavit; and Tharpe Affidavit.").)  The Court is unable to find support

for these claims in the voluminous documents Plaintiffs cite to support them.

See Gardner v. First Am. Title Ins. Co., 218 F.R.D. 216, 218 n.2 (D. Minn. 2003)

("[J]udges are not like pigs, hunting for truffles buried in [exhibits] and need not

excavate masses of papers in search of revealing tidbits . . . .") (cleaned up)

(citations omitted).  The Employee Handbook, which is part of Plaintiffs' Exhibit

G, is not evidence of what District officials testified to actually knowing.

Regarding documentation of disability complaints, AT's affidavit states

that during the October 14, 2015 IEP meeting, he told "the District" that its

decision to give AJT less than a full day of school did not comply with the ADA

and that this statement was documented in the meeting notes of Dan Wold,

Cedar Island Elementary School Principal and Amy Stafford, Coordinator.  (AT

Aff. ¶ 19.)  Plaintiffs' Exhibit D is a copy of meeting notes from the October 14,

2015 meeting.  They are unattributed/unsigned.  However, it seems clear the

notes were written by someone in the District because the notes originally had

AJT's name incorrect and later corrected with a pen or pencil.  (Pl. Ex. D at 1.)

AT attests that he again complained that the District's refusal to provide

AJT with a full day of instruction was discriminatory on October 19 or 20, 2015.

(AT Aff. ¶ 21.)  There is no citation to this complaint.  AT further attests,

> For the next six years, in countless IEP Team meetings, Conciliation Conferences, and other school meetings with District officials, we consistently complained that our daughter was being discriminated against, regressing (or not progressing at the same rate as when she was in Kentucky), and that she deserved a full school day similar to typical students and as she received in Kentucky.

(Id. ¶ 25.)   He also attests that although Emmons denied knowing anything about this dispute in her deposition, he and GT met with Emmons more than once to complain about the District's discriminatory treatment of AJT.   (Id. at 50.) AT believes that the Coordinators Emmons supervises dictated AJT's shortened day "and heard but ignored [Plaintiffs'] discrimination complaints."

> A properly supported motion for summary judgment is not defeated by self-serving affidavits.   Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.   A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.   Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.

Hoeft v. Eide, No. 17-CV-2526 (MJD/LIB), 2018 WL 6991103, at *4 (D. Minn. Oct. 25, 2018) (cleaned up; citations omitted), R&R adopted, 2018 WL 6523450 (D. Minn. Dec. 12, 2018), aff'd, 784 F. App'x 967 (8th Cir. 2019).

Here, Plaintiffs paint with too broad a brush when they discuss "all" District officials or Fredrickson, their licensing and professional obligations, and

who controlled their professional decision-making.  The only evidence Plaintiffs

cite in the record is the deposition testimony of Emmons.  Plaintiffs cite

generously to this document.  Plaintiffs cite no other evidence relating to other

officials.  The only "policy" in evidence is the TSES, which, in part, details Due

Process in IDEA cases.  (Pl. Ex. G at 24-25 (TSES).)  The District appears to have

followed this system by providing prior written notices and offering a

conciliation conference, mediation, a facilitated IEP meeting, or a due process

hearing.  (Id.; AT Aff. ¶ 49 (AT stating that instead of offering a second IEP team

meeting on July 11, 2022, Emmons offered Plaintiffs the options listed above).)

Even though Emmons was surprised by the District policy that states "[a]

pupil may receive special education services in more than one alternative based

on the IEP," her lack of knowledge did not rise to the level of bad faith or gross

misjudgment.  At most, she was negligent, which does not "clear the hurdle set

by the explicit language of section 504."  Bradley v. Arkansas Dep't of Educ., 301

F.3d 952, 956 (8th Cir. 2002) [Bradley I].  In addition, while the Court must accept

AT's accusation that Emmons advised he and GT to hire a PCA for AJT rather

than seek evening schooling, while insensitive, this remark did not rise to the

level of bad faith or gross misjudgment.

In addition, despite Plaintiffs' statement that "direct, specific and repeated Parent complaints to the District that failure to provide A.J.T. a full school day is disability discrimination, documented in its own records" (Doc. 38 at 6), Plaintiffs have only provided evidence of two documented complaints.  The October 14, 2015 IEP meeting notes state, "Dad asked if we will provide support in the evening. Amy shared that we don't provide both homebound and school support (modified).  Dad felt that this might conflict with ADA.  He wants Statute. His position is that she can handle a full day, it just can't start until Noon." (Pl. Ex. G at 14.)   The ADA is mentioned again in the November 16, 2015 PWN, which states that the IEP will remain in effect no later than January 14 when the team will re-evaluate and AT "will have the opportunity to look in a [sic] modified schedule through state, IDEA and ADA laws."  (Id. at 29.)  Plaintiffs include several IEPs and PWNs in Exhibit G.  (Pl. Ex. G1 at 28-51.)  However, Plaintiffs do not cite to them.  Even if Plaintiffs had done so, none of the IEPs and PWNs appear to mention discrimination.

Likewise, the District has included 11 IEPs and PWNs in its exhibits but Plaintiffs do not cite them. (See Def. Exs. 4, 11, 16-22, 26, 31-32.)  Even if Plaintiffs had cited to these exhibits, they would not support their allegations.  Except for

the two mentions of the ADA already discussed, none of these IEPs and PWNs

state that Plaintiffs expressed concern that the District was violating the ADA or

discriminating against AJT.  One complaint is contained in the April 30, 2018

email AT sent to Fredrickson stating that he had sent complaints about the

District to various state and federal agencies.  (Def. Ex. 23.)  The other complaint

that mentions discrimination was apparently resolved by the appointment of Dr.

Reichle to conduct an IEE.  (Def. Ex. 25 (ALJ Decision) at 3-4.)

On the other hand, the District provides support for its arguments that it

has "followed acceptable professional judgement and standards" as it made

educational decisions.  (Doc. 34 at 22.)  In response to concerns from AJT's

parents, the District lengthened AJT's school day past the ordinary 4:00 p.m.

conclusion in elementary school and the ordinary 2:40 p.m. conclusion in middle

school.  The District also modified AJT's IEPs in response to Dr. Reichle's IEE.

(Def. Ex. 7 (Dr. Reichle IEE), 31 (July 1, 2019 IEP containing Dr. Reichle sticky

notes), 32 (Sept. 18, 2019 IEP summarizing Dr. Reichle's IEE findings and

incorporating several of his suggestions).)  The District notes, however, that not

even Dr. Reichle collected any data about AJT's availability for learning from

5:30 to 6:00 p.m.  Emmons also testified that Fredrickson told her that AJT was

making progress when she was enrolled at Cedar Island and that there were "a lot of meetings with the parents or parent."  (Def. Ex. 1 (Emmons Dep.) at 98-99.)

Both Parties support their opinions regarding a reasonable number of hours for AJT's school day with Expert Reports.   Both Parties also cite testimony of Dr. Breningstall.  The District cites testimony stating that it would not hurt to ask if AJT's parents were willing to try instruction earlier in the day.  (Def. Ex. 6 (Breningstall Dep.) at 32.)  Plaintiffs cite Dr. Breningstall's administrative hearing testimony that starting school before noon would lead to "an inevitable worsening of [AJT's] problems" and that she could not see "on an experimental basis exposing [AJT] to an inevitable worsening of her problems."  (Def. Ex. 5 (Breningstall Admin. Hr'g Test.) at 273-74.)

Contrary to Plaintiffs' assertion that Emmons denied ever meeting AJT's parents, she admitted meeting AT during a meeting that was also attended by Fredrickson where AT explained why he wanted services for AJT in the home and Fredrickson explained why she did not agree.  (Def. Ex. 1 (Emmons Dep.) at 119-20.)  Emmons also stated that she attended "a conciliation [conference]" with AT.  (Id. at 124.)  There is no mention of "discrimination" or "the ADA" in the August 25, 2020 Summary of Conciliation Conference that documents this

31

encounter.  (Pl. Ex. G at 50-51 (Summ. of Conciliation Conference).)  Thus, it

seems that the disconnect between Emmons' statement that she knew nothing

about investigations regarding Plaintiffs' complaints and AT's attestation that he

and GT were in meetings with Emmons where they complained about AJT's

instruction can be resolved by this fact.

Emmons admits being in two meetings with AT.  These meetings were

focused on AJT's IEPs.  The conciliation conference was part of the District's

IDEA dispute resolution process, which Emmons testified is a different process

from the one used to address discrimination complaints.  (Id. at 15 (TSES); Def.

Ex. 1 (Emmons Dep.) at 48.)  Therefore, the meetings she attended with AT likely

focused on AJT's instruction and learning goals, not discrimination complaints.

In addition, resolution of this issue is not material to resolution of this motion.

See Amini, 643 F.3d at 1074 (explain that "a fact is material if its resolution affects

the outcome of the case").

Regarding the "shifting reasons" that the District gave for why they did

not provide AJT instruction both in school and in her home, in Osseo Area

Schools, the Court held that the services in AJT's IEP were limited by the length

of the traditional school day rather than by AJT's needs.  2022 WL 4226097, at

*14.  However, looking at the facts in the light most favorable to Plaintiffs, it is difficult to conclude that the District acted with bad faith or gross misjudgment.

Too many of Plaintiffs' arguments are unsupported and with all the District's attempts at conciliation, new IEPs, and inclusion of Dr. Reichel's suggestions, the Court cannot attribute "wrongful intent" to the District.  See B.M., 732 F.3d at 887 (a defendant's statutory noncompliance must reach a level of "wrongful intent" to establish § 504 or ADA liability); K.E. v. ISD No. 15, 647 F.3d 795, 805-06 (8th Cir. 2011) (under IDEA, IEP team must consider results of evaluations when developing an IEP); (see also Def. Exs. 7, 31, 32.)  Importantly, the District argues that AJT's school days are not shortened due to its decisions but due to AJT's health.

Likewise, although the Court did not agree with the District that the intense 1:1 and 2:1 services AJT receives make up for the loss of instructional hours when the District made the same argument in Osseo Area Schools, 2022 WL 4226097, at *13, failure to provide AJT a FAPE under the IDEA, alone, does

not mean the District discriminated against her.[3]  Brantley, 936 F. Supp. at 657

(holding that a "mere violation of the IDEA" does not violate § 504).

    While the District has not been perfect,

> [t]he reference in the Rehabilitation Act to "discrimination" must require,
> we think, something more than an incorrect evaluation, or a substantively
> faulty individualized education plan, in order for liability to exist.  Experts
> often disagree on what the special needs of a handicapped child are, and
> the educational placement of such children is often necessarily an arguable
> matter.  That a court may, after hearing evidence and argument, come to
> the conclusion that an incorrect evaluation has been made, and that a
> different placement must be required under [the IDEA], is not necessarily
> the same thing as a holding that a handicapped child has been
> discriminated against solely by reason of his or her handicap.  An
> evaluation, in other words, is not discriminatory merely because a court
> would have evaluated the child differently.

Monahan, 687 F.2d at 1170 (deciding case based on comparison to the Education

for All Handicapped Children Act ("EAHCA"), which is now the Individuals

with Disabilities Education Act ("IDEA")).

    Under the circumstances presented here, the District's officials exercised

professional judgment in a way that did not depart grossly from accepted

standards among educational professionals by convening multiple IEP meetings,

extending AJT's school day beyond the school day of her peers, implementing

---

[3] The District's brief in this case was filed almost two months prior to the Court
filing its decision in Osseo Area Schools.

many of Dr. Reichle's suggestions into AJT's IEPs, and by insuring that AJT always has at least one and often two aids with her at school.

Failure to provide extended schooling at home was at most negligent based on Emmons' apparent failure to understand the TSES. The District states that AJT's day is shortened because LGS prevents her from attending school prior to noon and the District will provide morning instruction should AJT's situation change to allow her to attend school earlier in the day.[4] Thus, Plaintiffs have failed to show the District acted with bad faith or gross misjudgment. Plaintiffs have not only failed to state a prima facie case under § 504 or the ADA but have also failed to prove there is a question of material fact regarding whether they have stated such a prima facie case.

---

[4] While not relevant to resolution of this motion, the Court notes that although it has appealed the decision, the District has complied with its order in <u>Osseo Area Schools</u> insofar as it has been providing in-home instruction from 4:30 to 6:00 p.m. <u>See</u> Pl. Ex. G5 (Jan. 3, 2022 PWN) at 26 (noting that District provides services from 4:30 to 6:00 p.m. "as a result of the ALJ order dated April 21, 2021").

### C.     Retaliation Claims

### 1.     Legal Standards

To establish a prima facie case of retaliation under § 504, AJT's parents must show (1) they were engaged in a protected activity, (2) the District took some adverse action, and (3) a causal connection between the activity and the District's action.  Albright ex rel. Doe v. Mountain Home Sch. Dist., 926 F.3d 942, 953 (8th Cir. 2019) (citation omitted).  The Eighth Circuit has not determined whether an adverse action against parents who exercised IDEA rights on behalf of their disabled child is an "adverse action" for a § 504 claim of retaliation.  See Bradley ex rel. Bradley v. Arkansas Dep't of Educ., 443 F.3d 965, 976-77 (8th Cir. 2006) [hereinafter Bradley II] ("To the extent they are relying on actions taken against someone other than David, it is not clear that such actions can support a § 504 claim.  The [parents] have identified no Eighth Circuit cases where action against a parent who is exercising IDEA rights on behalf of his disabled child has been determined to be 'adverse action' for a § 504 claim of retaliation," but not reaching the issue); see also Albright, 926 F.3d at 953 (summarily dispatching plaintiff's § 504 retaliation claims on procedural and factual grounds, but not stating whether the claims were proper).

### 2.    Plaintiffs' Arguments

Plaintiffs assert that the District retaliated against AJT's parents by (1) conducting "repeated, excessive, and unnecessary meetings without any good faith efforts to understand and serve AJT's individual needs, but were instead intended merely to wear her Parents down and into submission" (Amend. Compl. ¶ 60); (2) offering opinions regarding AJT's schooling and abilities that "were intended to insult, harass, intimidate, and coerce [her parents] into relinquishing AJT's right to a full school day in a manner likely to interfere with the enjoyment or exercise of ADA rights" (Id. ¶¶ 61-63); (3) suggesting that the only way AJT could have a full school day was if she could attend school on a standard school schedule, which was contrary to medical advice and was "without teacher or evaluation support" (Id. ¶ 64); (4) engaging in "glaring procedural violations" such as providing a shortened school day by "administrative fiat" without input from anyone who worked directly with AJT and based on "shifting excuses unrelated to her medical and educational needs," which were motivated by an intention to punish AJT's parents for their advocacy on behalf of their daughter, "to wear them down, and to force them to abandon their advocacy efforts in a manner likely to interfere with the enjoyment and

exercise of ADA rights" (Id. ¶ 65-68); (5) refusing to implement Dr. Reichle's recommendations made after his independent educational evaluation despite not expressing disagreement with his recommendations "to spite [AJT's] parents" (Id. ¶¶ 75-76); and (6) refusing to provide AJT a full day of schooling when the District never established that she needs a shortened day (Id. ¶¶ 77-79).

### 3.  Analysis

The Court assumes without deciding that AJT's parents were engaged in protected activity when they advocated on behalf of AJT in the IEP process. However, the District's actions Plaintiffs assert were retaliatory were not.  For support, Plaintiffs' state only, "There is strong evidence of retaliation and the connection to protected activity," with a footnote to "[AT] Aff."  (Doc. 38 at 41 & n.181.)  Again, a self-serving affidavit, without further evidentiary support, cannot overcome summary judgment.  Hoeft, 2018 WL 6991103, at *4.  Moreover, a closer look at Plaintiffs' arguments shows they do not establish a prima facie case because even if the District took negative actions against Plaintiffs, there is no evidence the actions were taken because of their advocacy.

First, as the District argues, it was obligated and/or entitled by District policy and various laws and rules to convene IEP meetings, conciliation

conferences, mediations, and other informal forms of dispute resolution to

attempt to craft AJT's IEPs.  (Doc. 34 at 26-27 (citing Minn. R. 3525.2810 subpt. 3;

Bradley II, 443 F.3d at 977; Dr. Breningstall Admin. Hr'g Test: "It doesn't hurt to

ask.").)  In addition, as discussed above, Plaintiffs insisted on more IEP meetings

at certain times relevant to this case.  See supra part II.B.  Moreover, to the extent

AJT's parents were upset by the early IEP proposals made by the District in

spring 2018 as the Parties were preparing for AJT's transition to middle school

(AT Aff. ¶¶ 27-30), the District was within its rights to propose draft IEPs "for

review and discussion" as long as AT and GT were allowed to comment on

them.  See Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d

648, 657 (8th Cir. 1999).  Therefore, reason 1 does not establish a prima facie case

of retaliation.  Moreover, in the course of those meetings, IEP team members

certainly discussed AJT's abilities and educational goals.  Thus, in the absence of

any cited support for Plaintiffs' arguments regarding harassment, insults, and

intimidation, reason 2 does not support a prima facie case of retaliation.

Second, contrary to Plaintiffs' assertion, the District adopted several of Dr.

Reichle's recommendations into AJT's IEP.  (Def. Exs. 7, 31, 32.)  Therefore,

reason 5 does not establish a prima facie case of retaliation.

Third, to the extent District employees were less outgoing and chatty after Plaintiffs filed their lawsuit, Plaintiffs provide no support for these statements. (AT Aff. ¶ 47.)  Furthermore, it is human nature to be more circumspect when employees learn about a lawsuit involving their employer and the subject of their own work.  Emmons testified that she told AJT's teacher "to ignore the legal stuff that was going on, . . . to teach AJT well and do what she believed to be the right thing for AJT."  (Def. Ex. 1 (Emmons Dep.) at 104.)

Finally, as the District asserts, <u>even if</u> District employees stated "that the only way AJT could have a full school day was if she could attend school on a standard school schedule" and the District provided a shortened school day by "administrative fiat" without input from anyone who worked directly with AJT, there is no evidence these things were done in retaliation for AJT's parents' advocacy.  Likewise, though Plaintiffs assert the District proffered "shifting excuses unrelated to AJT's medical and educational needs," and the District refused to provide AJT a full day of schooling when it never established that she needs one, there is no evidence that the District was retaliating against AJT's parents for their advocacy on behalf of their daughter.  Throughout the briefs and voluminous exhibits associated with this case, it is obvious the Parties have

fundamental differences of opinion regarding what constitutes a "full day" of

instruction for a student who does not start school until noon.  This disconnect is

based on the Parties' interpretations of the facts and the law, not on the District's

desire to retaliate against AJT's parents.

Even if administrative expediency was top of mind for the District when

officials made scheduling decisions—as the Court found in Osseo Area Schools—

evidence does not support that the District prioritized expediency as a form of

retaliation.  Thus, Plaintiffs have failed to prove there is a causal connection

between actions taken by the District and their advocacy.  Therefore, Plaintiffs

have not only failed to state a prima facie case of retaliation, Bradley II, 443 F.3d

at 976, but have also failed to prove there is a question of material fact regarding

whether they have stated such a case.

### D.    IDEA Claims

Plaintiffs have filed a claim for violations of the IDEA.  (Amend. Compl.

¶¶ 113-16.)   As part of that claim, they assert the District has refused to

implement the ALJ's Decision.  (Id. ¶ 116.)  AT states that the District failed to

timely secure eye-gaze technology, assigned one of AJT's home-school teachers

to another student and only re-instated her to AJT when AT told the District he

felt the reassignment was "continued animus and retaliation against our family,"

and attempted to create a home-school record that will show little or no progress by allowing teachers to cancel or arrive late for several home-school sessions and "secretly tracking" baseline data to support that outcome.  (AT Aff. ¶¶ 39-47.) Because the ALJ's Decision was not implemented, Plaintiffs filed the previously-mentioned complaint with the MDE on June 9, 2021.  (Amend Compl. ¶ 109.) The MDE found the District did not violate the ALJ's Decision.  (Def. Ex. 27.)

On September 13, 2022, after briefing was completed in this case, the Court affirmed the ALJ's Decision.  Osseo Area Schs., 2022 WL 4226097, at *21.  Among other things, the ALJ concluded that AJT established that adding "the provision of eye gaze technology . . . would result in an educational program that is responsive to her individual needs. . . ."  (Def. Ex. 25 (ALJ Decision) at 20.)

Plaintiffs have already filed one Motion for an Order to Show Cause why [the District] Should Not be Found in Contempt [of the Court's Order Affirming the ALJ's Decision].  Osseo Area Schs. II, 2022 WL 17082826, at *1.  Plaintiffs asserted that the District was not complying with the Court's Order affirming the ALJ's Decision regarding compensatory hours of education.  Id. at *1-2.  Now that the Court has affirmed the ALJ's Decision, the appropriate way to seek relief for a violation of that Order is to file another motion for an order to show cause.

42

Filing a new IDEA claim in this or another case was never the appropriate way to obtain relief.  As the District states, Plaintiffs' IDEA claim "is a thinly veiled attempt to re-litigate the issues . . . from the due process hearing."  (Doc. 34 at 30.)  Except for limited exceptions not relevant here, federal courts do not have original jurisdiction over claims brought pursuant to the IDEA.  Blackmon, 198 F.3d at 655-56 (discussing exhaustion); 20 U.S.C. § 1415(i)(2)(A).  In addition, the statute of limitations for filing appeals of IDEA decisions is 90 days.  20 U.S.C. § 1415(i)(2)(B).  Even assuming jurisdiction is proper in this Court, this "appeal," filed 104 days after the ALJ's Decision, is untimely.

Finally, even assuming the Court had jurisdiction over this claim, to the extent Plaintiffs wished to assert the claim in this Court, they had to do so as a compulsory counterclaim because the claim clearly arises out of the same transaction or occurrence that was the subject matter of Osseo Area Schools and no additional parties are required over whom the Court cannot acquire jurisdiction.  See Fed. R. Civ. Pro. 13(a)(1).  A compulsory counterclaim not asserted is waived.  Schinzing v. Mid–States Stainless, Inc., 415 F.3d 807, 813 (8th Cir. 2005).  Accordingly, Plaintiffs' claim is barred.

**IV.   ORDER**

Based upon the files, records, and proceedings herein**, IT IS HEREBY**

**ORDERED:**

Defendants' Osseo Area Schools, Independent School District No. 279 and

Osseo School Board's Motion for Summary Judgement **(Doc. 31)** is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 1, 2023            s/Michael J. Davis_____
                                    Michael J. Davis
                                    United States District Court